Opinion
KAUFMAN, J.
Defendant Oscar Lee Morris appeals (Pen. Code, § 1239, subd. (b))[1] from a judgment of death imposed under the 1977 death penalty law. (Former § 190 et seq.)[2] Defendant was convicted of first degree murder (§ 187), accompanied by a special circumstance finding that the murder was willful, deliberate and premeditated and was committed during the commission or attempted commission of a robbery. (Former § 190.2, subd. (c)(3)(i).) Defendant was also found guilty of robbery (§ 211). In addition it was found that during both the murder and robbery defendant had used a *10 firearm. (§§ 12022.5 and 1203.06, subd. (a)(1).) A petition for writ of habeas corpus was filed in conjunction with the appeal, and we issued an order to show cause thereon. For purposes of consideration and disposition, we have consolidated the two matters herein. For the reasons set forth hereafter, we have concluded that the judgment must be affirmed as to the conviction of first degree murder, but reversed as to the robbery; that the special circumstance finding must be set aside and the judgment reversed as to penalty; and that the matter should be remanded for resentencing in accordance with the determinations set forth herein.
I
Facts

The Circumstantial Evidence

About 5 a.m. on September 3, 1978, a Long Beach police officer responded to an incident at a public bathhouse located on the beach near the intersection of Ocean and Molino Avenues. The officer heard people shouting that someone had been shot. Descending a flight of stairs to the bathhouse, the officer discovered that a White male, later identified as William J. Maxwell, had been shot several times. Mr. Maxwell died within a few seconds of the officer’s arrival. The bathhouse in question was known to the officer as a meeting place for the gay community and had been the scene of numerous robberies.
The cause of death was determined to be two gunshot wounds to the head and abdomen. A spent slug was found near the body. The wounds indicated that both shots were fired from close range and were consistent with the use of a .38-caliber long-barrel revolver.
A witness to the shooting, Verner Billdt, was walking near the bathhouse on the morning in question when he heard gunfire coming from the entrance to the bathhouse restroom. He heard approximately five shots. Mr. Billdt turned toward the sound of the shots and saw a Black man standing in the doorway of the restroom, facing inside, firing. He did not see the man’s face. Mr. Billdt immediately ran up the stairs and across the street, turned, and saw a man running toward a vehicle. He believed that it was the same man he had seen in the restroom because he had the same general build and height and wore the same clothing. Mr. Billdt observed the man enter a yellow Toyota compact and drive away. At trial, Mr. Billdt identified defendant as having the same general size and shape as the man he observed firing into the restroom.
*11 Mona Harrison had been defendant’s girlfriend during the early part of 1978. She and defendant had lived together in Long Beach until the relationship ended sometime that summer, several months before the shooting. Ms. Harrison owned a 1978 yellow Toyota compact which defendant drove frequently. After he moved out of the house defendant continued to have access to the Toyota, although Ms. Harrison could not recall whether he had used it at all during the month of September 1978. Mr. Billdt could not confirm that Ms. Harrison’s car was the same vehicle he had seen on the morning of the murder, although he believed that it “look[ed] like it.”
Robert Hernandez had been a friend of Mr. Maxwell and had lived with him for a period of time. In July 1978, two months before the murder, Mr. Hernandez loaned his Sears credit card to Mr. Maxwell to purchase some equipment. He never saw the card again.
Calvin Johnson was working as a sales clerk in a Sears store in Los Angeles on September 6, 1978, three days after the murder of William Maxwell, when a man presented a credit card bearing the name Robert Hernandez. After observing the man’s behavior for a short time, Mr. Johnson became suspicious and contacted security. The man left, however, before he could be questioned.
Four months later, in January 1979, Long Beach police investigators asked Mr. Johnson if he could identify the man from a number of photographs, including that of defendant. Mr. Johnson told the police that the photograph of defendant “looked like” the person who presented the Sears card. At trial, Mr. Johnson positively identified defendant as the man who presented Robert Hernandez’s credit card, although on cross-examination Johnson conceded that defendant only “look[ed] like” the man.

The Testimony of Joe West

Joe West had known defendant since boyhood and had seen him regularly over the years. West testified that sometime between Thanksgiving and mid-December 1978, defendant informed him that he had recently been making money of “dates” with homosexuals and that he had killed a “white homosexual” at a bathhouse in Long Beach. According to West, defendant gave no reason for the murder other than that “he had to kill one.” West also testified that defendant drove him to the bathhouse in Long Beach where defendant said the killing had occurred and gave him a .38-caliber revolver which defendant said he had used to commit the murder. Ballistic tests showed that the slug recovered from the murder scene was consistent with the characteristics of the .3 8-caliber revolver that defendant had entrusted to West.
*12 West further testified that several months after the murder of William Maxwell, he and defendant had a falling out. West admitted that on one occasion in January 1979 he fired a shotgun at defendant but missed. Later the same day, West returned to defendant’s house with a friend named Bruce Thompson. At West’s instigation, Thompson changed into West’s clothes, entered defendant’s house, and was shot and killed by defendant.[3]

Circumstances Underlying the Precharging Delay

West testified that shortly after the Bruce Thompson incident he went to the Los Angeles police with information concerning defendant’s role in the murder of William Maxwell. According to West, his motive for going to the police was his recent “quarrel” with defendant. The Los Angeles police conveyed West’s information to the Long Beach Police Department.
By February 1979, in addition to the facts obtained from West, the Long Beach police had learned through interviews with Verner Billdt and Mona Harrison that defendant had access to an automobile which resembled the car driven by William Maxwell’s assailant, and had learned from Calvin Johnson that the man who presented Robert Hernandez’s credit card looked like defendant.
Shortly thereafter, however, the Maxwell murder investigation came to an abrupt halt. The Long Beach police officers assigned to the case were transferred and the case file, rather than being reassigned, was inadvertently placed in the closed-case file and transferred to the archives.
The case remained in the archives, and no further investigation was undertaken, until May 1982, over three years later, when Joe West, then on parole from a prison term for an unrelated offense, was arrested in Santa Monica on grand theft charges. Upon his arrest, West contacted the Long Beach police with information concerning defendant’s role in the Maxwell murder. That information led to the reopening of the investigation and ultimately the filing of charges against defendant.

Defense Evidence

The defense called only one witness, Virginia Hooper. Ms. Hooper testified that she and defendant had lived in a “husband-wife” type of relationship for several months prior to the murder. Ms. Hooper stated that one *13 night in August 1978, Joe West had entered her apartment while defendant was away and “tried to force his self [s/c] on me and I just told him to get out . . . .”
II
Discussion
A. Expiration of the Statute of Limitations
 Defendant contends that his robbery conviction (§ 211) and the special circumstance finding based thereon (former § 190.2, subd. (c)(3)(f)) must be reversed because the statute of limitations applicable to robbery had expired prior to the filing of the information.[4] We conclude that the expiration of the statute of limitations invalidated the charge of robbery, but constituted no impediment to the filing of the robbery-murder special circumstance.
1. The Robbery
It is undisputed that the information charging defendant was filed subsequent to the expiration of the three-year statute of limitations then applicable to robbery.[5] Hence, there is no question that defendant was not properly convicted of robbery. “In criminal cases, the state, through its legislature, has declared that it will not prosecute crimes after the [limitations] period has run, and hence has limited the power of the courts to proceed in the matter. [Citations.] It follows that where the pleading of the state shows that the period of the statute of limitations has run, and nothing is alleged to take the case out of the statute, for example, that the defendant has been absent from the state, the power to proceed in the case is gone.” (People v. McGee (1934) 1 Cal.2d 611, 613-614 [36 P.2d 378], italics added; accord People v. Chadd, supra, 28 Cal.3d at pp. 756-757.)
It is obvious, therefore, that the robbery conviction must be reversed.
*14 2. The Robbery-murder Special Circumstance
Defendant contends that because the robbery was time-barred, the special circumstance allegation based on the commission of the robbery was barred as well. This contention lacks merit.
It is well settled that the statute of limitations applicable to the underlying felony is immaterial to the charge and conviction of felony murder. (People v. Terry (1969) 70 Cal.2d 410, 422-423 [77 Cal.Rptr. 460, 454 P.2d 36]; People v. Risenhoover (1968) 70 Cal.2d 39, 49-50 [73 Cal.Rptr. 533, 447 P.2d 925].) The crime of murder is independent of the underlying felony. (People v. Cantrell (1973) 8 Cal.3d 672, 680-681 [105 Cal.Rptr. 792, 504 P.2d 1256], disapproved on other grounds, People v. Wetmore (1978) 22 Cal.3d 318, 324, fn 5 [149 Cal.Rptr. 265, 583 P.2d 1308].) Therefore, the underlying felony need not be charged as a separate substantive offense, and the fact that it is time-barred does not preclude a prosecution for felony murder. (People v. Risenhoover, supra, 70 Cal.2d at pp. 49-50.)
Notwithstanding the settled rule with respect to felony murder, defendant nevertheless contends that a felony-murder special circumstance may not be alleged after the statute of limitations as to the underlying felony has expired. The basis of the distinction, according to defendant, is found in section 190.4, subdivision (a) which provides in pertinent part as follows: “Whenever a special circumstance requires proof of the commission or attempted commission of a crime, such crime shall be charged and proved pursuant to the general law applying to the trial and conviction of the crime.” (Former § 190.4, under which defendant was tried, contained the same provision as current § 190.4.) Because the statute of limitations constituted a jurisdictional bar to the robbery, defendant argues that the robbery could not be “charged” as required under section 190.4 and therefore that the robbery-murder special circumstance could not properly be alleged.
Defendant’s contention lacks merit, for it assumes section 190.4 requires that the defendant must be charged with, and convicted of, the special circumstance felony as a substantive offense. That is a false assumption. As more fully explained below, section 190.4 does not require that the underlying felony must be charged as a separate, substantive offense. The pleading requirement of the statute was satisfied by the allegation of the special circumstance felony in the same count that charged the defendant with murder. Moreover, section 190.4 merely provides that the underlying offense must be “proved”; there is no requirement of a valid “conviction” of the felony as a substantive offense. Thus, the fact that defendant could not *15 properly be charged with or convicted of the robbery as a substantive offense did not bar prosecution of the robbery-murder special circumstance.
In construing legislative intent, it is fundamental that a statute should not be interpreted in a manner that would lead to absurd results. (People v. Barksdale (1972) 8 Cal.3d 320, 334 [105 Cal.Rptr. 1, 503 P.2d 257].) The practical effect of construing section 190.4 to require that a special circumstance felony be charged as a substantive offense would be a direct violation of that fundamental rule of statutory construction. There is, of course, no statute of limitations applicable to the crime of murder (§ 799; People v. Zamora (1976) 18 Cal.3d 538, 547 [134 Cal.Rptr. 784, 557 P.2d 75]), and the death penalty statute contains no express limitations period applicable to felony murder or any other capital offense. To adopt the interpretation of section 190.4 urged by defendant, however, would be to create—by judicial fiat—a singular exception to this general rule. We would, in effect, have created a statutory immunity from capital punishment available exclusively to those who commit special circumstance felony murders and subsequently manage to avoid prosecution for the requisite number of years under the applicable felony statute of limitation. To state the proposition is to demonstrate its unacceptability. There is not the slightest indication the Legislature intended to create such an anomalous exception to the death penalty statute, and we decline to interpret the statutory language as doing so.
Our interpretation of section 190.4, however, does not rest simply on the anomalous consequences that would result from a contrary construction. The most basic principle of statutory construction is that courts must give effect to statutes according to the ordinary import of the language used in framing them. (California Teachers Assn. v. San Diego Community College Dist. (1981) 28 Cal.3d 692, 698 [170 Cal.Rptr. 817, 621 P.2d 856].) “If the words of the statute are clear, the court should not add to or alter them to accomplish a purpose that does not appear on the face of the statute or from its legislative history.” (People v. Knowles (1950) 35 Cal.2d 175, 183 [217 P.2d 1]; accord, California Teachers Assn. v. San Diego Community College Dist., supra, 28 Cal.3d at p. 698.)
 When the plain language of section 190.4 is construed in view of its ordinary meaning, the illogic inherent in the construction urged by defendant becomes readily apparent. Section 190.4 provides that whenever a special circumstance requires proof of the commission or attempted commission of a crime, that crime must be “charged and proved . . . .” Defendant’s argument assumes that when the Legislature wrote “charged,” what it actually intended was “charged as a substantive crime in an independent count of the accusatory pleading.” Obviously, the statute contains *16 no such explanatory language. In its ordinary sense, “charged” means simply “To blame, accuse or impute something to . . . .” (American Heritage Diet. (2d college ed. 1982) p. 259.) As a matter of common usage, to be “charged” does not necessarily mean to be formally charged with a substantive offense; it means simply to be accused of a certain act or deed. A formal accusation of a substantive crime is not implicit in the term.
It could, however, be argued that to be “charged” in the context of the Penal Code invariably means just that—to be formally accused of a substantive offense. Even a cursory review of the code, however, reveals otherwise. Sections 969c and 969d, for example, define the requirements for the pleading of firearm enhancements. Firearm enhancements, like special circumstances, are not substantive crimes. (People v. Superior Court (Engert) (1982) 31 Cal.3d 797, 803 [183 Cal.Rptr. 800, 647 P.2d 76]; Ghent v. Superior Court (1979) 90 Cal.App.3d 944, 953 [153 Cal.Rptr. 720].) Yet significantly, both of these sections provide that a firearm enhancement may be “charged in the accusatory pleading”—the identical term used in section 190.4—and both sections then proceed to explain that the enhancement allegation “shall be added to and be a part of the count or each of the counts of the accusatory pleading” which charge the substantive offense during which the defendant was allegedly armed with or used a weapon. (§§ 969c, 969d, italics added.) As these sections make clear, therefore, the term “charged” is not invariably employed in the code to refer to the allegation of a substantive crime.
That the legislative purpose underlying section 190.4 was precisely not, in fact, to require the substantive pleading or conviction of a special circumstance felony is evident from the plain language of the statute as a whole. Statutory language should not be interpreted in isolation, but must be construed in the context of the entire statute of which it is a part, in order to achieve harmony among the parts. (People v. Shirokow (1980) 26 Cal.3d 301, 306-307 [162 Cal.Rptr. 30, 605 P.2d 859].) Section 190.4, in addition to requiring that the underlying crime be “charged,” also provides that the offense must be “proved pursuant to the general law applying to the trial and conviction of the crime.” (Italics added.) Significantly, the Legislature did not require that the defendant must be “convicted” of the underlying offense, merely that the proof of the offense must be sufficient to support a conviction. The only plausible circumstance wherein the special circumstance felony must be proved, but where that proof need not result in a conviction, is where the felony need not be formally charged as a substantive crime. The inescapable inference is that the Legislature fully intended that the elements of the special circumstance felony must be formally proved, but that the special circumstance felony need not be pleaded as a separate, substantive crime of which the defendant must be convicted.
*17 Defendant argues, however, that this construction of section 190.4 effectively “guts” the statute of any substantive meaning. Not so. As earlier noted, the general rule in a noncapital case is that the People need not explicitly plead the underlying felony so long as the defendant is otherwise put on notice of the charges against him. (People v. Risenhoover, supra, 70 Cal.2d at pp. 49-50.) The purpose of section 190.4 was to impose an express notice requirement in capital cases by commanding that the constituent felony be alleged in the accusatory pleading and that the elements of the constituent felony be proved beyond a reasonable doubt “pursuant to the general law applying to trial and conviction of crime.”
Defendant also contends that this interpretation of section 190.4 would produce an “anomalous result” by permitting an otherwise time-barred felony to be alleged as a special circumstance. Defendant overlooks the obvious. The courts have long permitted felony-murder prosecutions notwithstanding the expiration of the felony statute of limitations for the simple reason that the prosecution is for murder, not for the underlying felony. (See People v. Washington (1965) 62 Cal.2d 777, 781 [44 Cal.Rptr. 442, 402 P.2d 130].)
Finally, defendant argues that our holding conflicts with prior decisions of this court, including People v. McDonald (1984) 37 Cal.3d 351 [208 Cal.Rptr. 236, 690 P.2d 709, 46 A.L.R.4th 1011], People v. Green (1980) 27 Cal.3d 1 [164 Cal.Rptr. 1, 609 P.2d 468], People v. Mattson (1984) 37 Cal.3d 85 [207 Cal.Rptr. 278, 688 P.2d 887], People v. Robertson (1982) 33 Cal.3d 21 [188 Cal.Rptr. 77, 655 P.2d 279] and People v. Velasquez (1980) 26 Cal.3d 425 [162 Cal.Rptr. 306, 606 P.2d 341], Not so.
In People v. McDonald, supra, 37 Cal.3d 351, the jury found a special circumstance allegation of robbery-murder to be true but acquitted the defendant of the substantive charge of robbery. We reversed the conviction on other grounds and noted, for the guidance of the court on retrial, that the failure of proof as to the robbery barred, on double jeopardy principles, a retrial of the robbery-murder special circumstance. (Id. at pp. 377-378.) In People v. Green, supra, 27 Cal.3d 1, we were confronted with a similar situation. There, we held that the evidence was insufficient as a matter of law to support the underlying felony (kidnapping), and therefore concluded that the kidnapping special circumstance must also be set aside. (Id. at p. 74.) Thus, our holdings in McDonald and Green were each premised on section 190.4’s requirement that the underlying special circumstance offense must be “proved . . . pursuant to the general law . . . .” (Italics added.)[6]Neither *18 decision supports defendant’s contention that section 190.4 also requires a separate charge and conviction of the underlying offense.
People v. Mattson, supra, 37 Cal.3d 85, was similarly concerned with the manner and nature of the proof required to support a special circumstance finding. We held in Mattson that the general law proviso of section 190.4 incorporates the corpus delicti rule generally applicable to proof of felony offenses, and therefore that “the corpus delicti of felony-based special circumstances must be established independently of an accused’s extrajudicial statements.” (Id. at pp. 93-94.)
Thus, Mattson and McDonald together teach that the proof necessary to support a felony-based special-circumstance finding must be of the same quality, quantity and nature required under the general law to support a conviction of the substantive felony. Neither case, however, supports defendant’s contention that the accused must be separately charged and convicted of the felony itself.
People v. Robertson, supra, 33 Cal.3d 21 and People v. Velasquez, supra, 26 Cal.3d 425, are equally unhelpful to defendant. In both cases we assumed that the government had erred in failing to charge the defendants with the underlying special-circumstance felony, but ruled that any error was harmless since defendants were otherwise informed of the nature of the special circumstances alleged. (33 Cal.3d at pp. 47-48; 26 Cal.3d at p. 434, fn. 6.) Although, upon further reflection, that assumption was unwarranted, both cases clearly demonstrate that a separate conviction of the underlying felony is not required under section 190.4.
We hold, therefore, that the robbery-murder special circumstance was not barred by the expiration of the statute of limitations applicable to the robbery.[7]
*19 B. Sufficiency of the Evidence of Robbery and the Robbery-murder Special Circumstance
Defendant maintains there was insufficient evidence as a matter of law to support the finding of the robbery-murder special circumstance. We agree.
In resolving a contention based upon insufficiency of the evidence, the reviewing court’s task is to determine whether a reasonable trier of fact could have found that the prosecution sustained its burden of proving the defendant guilty beyond a reasonable doubt. (People v. Johnson (1980) 26 Cal.3d 557, 576 [162 Cal.Rptr. 431, 606 P.2d 738, 16 A.L.R.4th 1255].) The judgment must be supported by “substantial evidence,” which has been defined as evidence that “reasonably inspires confidence and is of ‘solid value.’ ” (People v. Bassett (1968) 69 Cal.2d 122, 139 [70 Cal.Rptr. 193, 443 P.2d 777]; see People v. Javier A. (1985) 38 Cal.3d 811, 819 [215 Cal.Rptr. 242, 700 P.2d 1244].) The rules governing sufficiency of the evidence are as applicable to challenges aimed at special circumstance findings as they are to claims of alleged deficiencies in proof of any other element of the prosecution’s case. (People v. Thompson (1980) 27 Cal.3d 303, 323, fin. 25 [165 Cal.Rptr. 289, 611 P.2d 883].)
In order to find the robbery-murder special circumstance to have been true, the jury here was required to find that the murder was committed “during the commission or attempted commission of’ a robbery. (Former § 190.2, subd. (c)(3).) Moreover, as noted in the preceding section, a valid special circumstance finding requires that the underlying felony be “proved.” (Former § 190.4.) Hence, there were two necessary prerequisites to the jury’s special circumstance finding: 1) substantial evidence of the robbery, and 2) substantial evidence that the murder was committed during the commission or attempted commission of the robbery. (People v. Green, supra, 27 Cal.3d at pp. 52, 59.) As will appear, neither of these conditions was satisfied in this case.
“Robbery” is defined as “the felonious taking of personal property in the possession of another, from his person or immediate presence, and against his will, accomplished by means of force or fear.” (§211.) Hence, a conviction of robbery cannot be sustained in the absence of evidence that the defendant conceived his intent to steal either before committing the act of force against the victim, or during the commission of that act; if the intent arose only after the use of force against the victim, the taking will at most constitute a theft. (People v. Green, supra, 27 Cal.3d at pp. 52-54.)
The relevant facts are essentially undisputed. The victim, Mr. Maxwell, was shot twice from close range in the restroom of a public bathhouse. The *20 police responded within minutes of the shooting. Mr. Maxwell died almost immediately upon their arrival. Photographs revealed that the victim was entirely nude except for shoes and socks; no other clothing or personal possessions were visible in the photographs. The record contains no evidence that any personal property was in the victim’s possession at the time of the murder, or that any personal property of the victim was ever recovered subsequent to the murder with the possible exception of the credit card.
Other than Verner Billdt, whose only observation was of shots being fired, there were no witnesses to any of the events surrounding the shooting.
No motive or explanation for the murder was disclosed at trial other than the statement attributed to defendant by Joe West, to wit: “. . . he go out there and make money, you know, with these homosexuals, you know, dates—he had to kill one.”
Three days after the murder, a man whom Calvin Johnson identified as defendant or “look[ing] like” defendant presented a Sears credit card that belonged to Robert Hernandez. Mr. Hernandez had loaned the card to the victim in July 1978, two months before the murder. No charges were made to the card during the intervening period.
The foregoing constitutes the totality of the evidence pertaining to the alleged robbery and robbery-murder special circumstance. There is obviously nothing here from which the jury could reasonably infer that defendant deprived the victim of personal property in his possession by means of force or fear.[8] The evidence merely shows that the assailant shot the victim, who was nude, and shortly thereafter a man who resembled the assailant was observed running from the scene to a waiting car. It is impossible to make a reasonable inference from these facts that the taking occurred either before or during the shooting, that the taking was from the person of the victim, and that the taking was accomplished by means of force or fear. If, prior to the shooting, the assailant removed the credit card from the victim’s clothes, then the taking constituted a theft but not a robbery. Similarly, if, prior to the shooting, the victim volunteered the credit card to his assailant as a form of consideration for sexual services, then no robbery was committed.
*21 We may speculate about any number of scenarios that may have occurred on the morning in question. A reasonable inference, however, “may not be based on suspicion alone, or on imagination, speculation, supposition, surmise, conjecture, or guess work, [fl] . . .A finding of fact must be an inference drawn from evidence rather than ... a mere speculation as to probabilities without evidence.” (California Shoppers, Inc. v. Royal Globe Ins. Co. (1985) 175 Cal.App.3d 1, 45 [221 Cal.Rptr. 171], quoting Brautigam v. Brooks (1964) 227 Cal.App.2d 547, 556-557 [38 Cal.Rptr. 784] (internal quotation marks deleted).) In the absence of any substantial evidence that the taking was accomplished either before or during the killing by means of force or fear, we must conclude that the evidence will not support a conviction of robbery. Absent substantial proof of the robbery, the special circumstance finding of robbery-murder must fall. (Former § 190.4; People v. Green, supra, 27 Cal.3d at p. 52.)
For similar reasons, it is clear that the evidence was not sufficient to establish that the murder was committed “during the commission or attempted commission of’ the robbery. (Former § 190.2, subd. (c)(3)(i).) Under the special circumstances statute, as this court explained in Green and Thompson, whether or not a murder was committed during the commission of a robbery or other felony is not merely “a matter of semantics or simple chronology.” (People v. Green, supra, 27 Cal.3d at p. 60; People v. Thompson, supra, 27 Cal.3d at p. 322.) “A murder is not committed during a robbery within the meaning of the statute unless the accused has ‘killed ... in order to advance an independent felonious purpose, . . .’ [Citation.] A special circumstance allegation of murder committed during a robbery has not been established where the accused’s primary criminal goal ‘is not to steal but to kill and the robbery is merely incidental to the murder ....’” (People v. Thompson, supra, 27 Cal.3d at p. 322, quoting People v. Green, supra, 27 Cal.3d at pp. 60-61, original italics.)
The record in the case at bench contains virtually no evidence that the murder was committed “during” the commission of a robbery. The only witness to the incident merely observed shots being fired and saw the shooter run from the scene to a waiting car. The victim was apparently nude when shot and expired minutes later. On this sparse record, it is impossible to conclude that the shooting was one to advance an independent felonious purpose. (People v. Thompson, supra, 27 Cal.3d at p. 324.) The fact that the bathhouse in Long Beach where the murder occurred had been the scene of robberies in the past hardly established that a robbery was committed in this case. Indeed, the only evidence in the record even remotely related to motive was defendant’s alleged admission to West that he had been making money off “dates” with homosexuals and that “he had to kill one.” While this statement might suggest that defendant went to the *22 bathhouse to commit prostitution and committed murder, it provides no basis to infer that he committed a robbery. On the record before us, we cannot say the prosecution sustained its burden of proving beyond a reasonable doubt the killing occurred “during the commission of a robbery.” (People v. Green, supra, 27 Cal.3d at p. 60; People v. Thompson, supra, 27 Cal.3d at p. 324.)
We hold, therefore, that the evidence was insufficient as a matter of law to support the special circumstance finding of robbery-murder. That finding, and the penalty judgment based thereon, must therefore be set aside, and further proceedings on this allegation are barred by the double jeopardy clause. (People v. Green, supra, 27 Cal.3d at p. 62.)
C. Evidence of Willful, Deliberate and Premeditated Murder
1. Sufficiency of the Evidence
Defendant contends the evidence was insufficient to prove that the murder was willful, deliberate and premeditated. This contention lacks merit.
Under the familiar tripartite test of People v. Anderson (1968) 70 Cal.2d 15, 26-27 [73 Cal.Rptr. 550, 447 P.2d 942], we focus on three categories of evidence of premeditation and deliberation: (1) planning activity prior to the killing, (2) evidence of motive to kill, derived from defendant’s prior relationship or conduct with the victim, and (3) the manner of killing, indicating some preconceived design to kill. As explained in Anderson, a reviewing court will sustain a conviction where there exists evidence of all three elements, where there is strong evidence of prior planning activity, or where there exists evidence of a motive to kill, coupled with evidence of either planning activity or a manner of killing which indicates a preconceived design to kill. (Ibid.) In the present case, the record contains sufficient evidence of these elements to permit a reasonable inference the killing was willful, deliberate and premeditated.
As to prior planning activity, the evidence—viewed in the light most favorable to the judgment—showed that defendant brought a .3 8-caliber revolver to a public bathhouse during the early morning hours, parked his car near by, and shot the victim twice from close range inside an enclosed restroom with no witnesses present. After the shooting, defendant ran a short distance to his car and made a successful escape.
In view of the fact that a killing in fact ensued, the foregoing evidence is sufficient to support a reasonable inference that defendant went to the *23 bathhouse with either a preconceived design to kill, or fully prepared to do so. Defendant’s possession of a weapon in advance of the killing, and his rapid escape to a waiting car moments afterwards, amply support an inference of planning activity. (People v. Wright (1985) 39 Cal.3d 576, 593 [217 Cal.Rptr. 212, 703 P.2d 1106]; People v. Haskett (1982) 30 Cal.3d 841, 850 [180 Cal.Rptr. 640, 640 P.2d 776].) Though the exact motive for the killing does not appear, the evidence strongly suggests that homosexual prostitution was involved. Clearly, when one plans to engage in illicit activity at an isolated location during the early morning hours, and one brings along a deadly weapon which is subsequently employed, it is reasonable to infer that one “considered the possibility of homicide from the outset.” (People v. Alcala (1984) 36 Cal.3d 604, 626 [205 Cal.Rptr. 775, 685 P.2d 1126].) Thus, there is substantial evidence of a “planned” killing—the most important prong of the Anderson test (supra, 70 Cal.2d 15).
There is also strong evidence relating to the manner of killing. The victim died of two gunshot wounds, one to the head and one to the abdomen, fired from a distance of two to eight inches. Wounds of this nature, as a result of shots fired from point-blank range, evince a calculated and deliberate design to kill, not an indiscriminate shooting in the heat of passion. Premeditation, as we have frequently observed, “is not measured by duration of time.” (People v. Wright, supra, 39 Cal.3d at p. 593.) A “ ‘cold, calculated judgment may be arrived at quickly . . . .’” (Ibid.) The fact that defendant shot the victim twice from close range could reasonably, support an inference by the jury that the manner of killing was “ ‘particular and exacting.’ ” (Id. at p. 594.)
Under all the circumstances, therefore, we conclude that the evidence is sufficient to support the jury’s determination the murder was willful, deliberate and premeditated.
2. The Jury’s Finding of Willful, Deliberate and Premeditated Murder
 Notwithstanding the sufficiency of the evidence that the murder was willful, deliberate and premeditated, defendant contends that the murder conviction must be reversed because, in addition to being instructed on premeditated murder, the jury was also instructed on a theory of felony murder, as to which the evidence was legally insufficient.[9] Defendant argues *24 that the record does not reveal on which theory the jury based its verdict, and therefore asserts that the first degree murder conviction must be reversed. This contention is meritless.
In People v. Green, supra, 27 Cal.3d 1, we observed that “the governing rule on appeal is both settled and clear: when the prosecution presents its case to the jury on alternate theories, some of which are legally correct and others legally incorrect, and the reviewing court cannot determine from the record on which theory the ensuing general verdict of guilt rested, the conviction cannot stand.” (id. at p. 69, italics added.) In the present case, the jury expressly found that defendant committed the murder during the commission or attempted commission of a robbery and that the murder was willful, deliberate and premeditated.[10] Thus, the jury clearly found that the murder was willful, deliberate and premeditated. Any error in instructing on felony murder, therefore, could not have affected the result (see People v. Boyd (1985) 38 Cal.3d 762, 770 [215 Cal.Rptr. 1, 700 P.2d 782]), and we are permitted to conclude that the verdict was based on a finding the murder was willful, deliberate and premeditated.
D. Failure to Disclose Evidence
In a petition for habeas corpus consolidated with this appeal, defendant contends his conviction must be reversed because of due process violations stemming from the district attorney’s failure to disclose evidence bearing on the credibility of the prosecution’s key witness, Joe West. The facts and law underlying the contention are set forth below.
As earlier noted, Joe West testified on direct examination by the prosecutor that his motive for cooperating with the prosecution was a quarrel with defendant which resulted in his attempt on defendant’s life, and defendant’s subsequent shooting of his friend, Bruce Thompson.
As its final witness, the prosecution called William Collette, the Long Beach police detective in charge of the Maxwell murder investigation. The prosecutor concluded his direct examination of Detective Collette with the following question: “At the time that you talked to Mr. West and the time that he gave you the information about this case, did he ask you for any favor or remuneration or payment in either cash or in kind?” Collette responded: “He did not.” The prosecutor repeated and broadened the question: “Did he ever?” Collette answered: “No, sir.”
*25 On cross-examination, Detective Collette acknowledged that West was in custody in the Los Angeles County jail when he first contacted the detective in June 1982, and that sometime thereafter he was released from jail.
In his closing argument, the deputy district attorney returned to the subject of West’s motives for testifying against defendant, reminding the-jury that defendant had “killed [West’s] friend,” Bruce Thompson. Defense counsel, in response, pointed out during closing argument that West had been in jail on felony charges when he “miraculously” contacted the police and thereafter had received a lenient sentence. During rebuttal argument, however, the prosecutor emphatically refuted the implication that West had received any consideration from the prosecution in return for his testimony, stating as follows: “[Defense counsel] implies or certainly asks you all to infer that Mr. West is getting something for his testimony here . . . . [fl] And there is no evidence, not a shred, and you would have it if it existed, if Mr. West got any benefit from this case, that is, in the handling of his criminal case.”
During the five years since defendant’s trial and conviction, certain additional evidence relating to West’s testimony—evidence which was not adduced at trial—has come to light. A portion of this new evidence was revealed about one year after trial, at a postconviction hearing to augment the appellate record; the remainder came to light in connection with briefing filed with this court in response to an order to show cause which we issued in response to defendant’s petition for habeas corpus. The full story that emerges is set forth below.
On May 22, 1982, Joe West was arrested in Santa Monica on charges of grand theft auto and felony joyriding. The arrest led to a parole hold which in turn resulted, in July 1982, in the revocation of West’s parole and the imposition of a one-year state prison sentence. At the time of West’s arrest, the Maxwell murder investigation had been dormant for over three years, the result of the file having been inadvertently placed in the archives as a closed matter.
In June 1982, shortly after his arrest, West contacted Detectives Miller and Collette of the Long Beach Police Department to inquire as to the status of the Maxwell murder investigation. In separate declarations filed with this court, Detectives Miller and Collette state that West informed them he was afraid of defendant because it was West’s testimony that had implicated defendant in the Bruce Thompson killing and had led to defend *26 ant’s plea of guilty to manslaughter and sentence to state prison.[11] According to Detectives Miller and Collette, West hoped to ensure that defendant remained in prison, and therefore expressed a willingness to provide both information and testimony. Both detectives flatly deny that West requested or received any promises of leniency concerning the disposition of the Santa Monica felony charges or the parole violation in exchange for his cooperation.
Joe West’s account of how he came to testify against defendant conflicts with that of Detectives Miller and Collette. West states in a declaration filed with this court that the police expressly offered assistance in exchange for his cooperation and testimony: “Detectives Collette and Miller told me if I testified against Morris they would go to bat for me and talk to the judge about my Santa Monica case and my parole hold. They said they could not guarantee anything.” Although both detectives emphatically deny that any promises were made in exchange for testimony, both readily acknowledge (in identical statements) that “[bjecause of Mr. West’s expressed concerns about his safety, [we] represented that we would inform the court in the Santa Monica case and the parole authorities of his cooperation, and request any consideration that could be given him." (Italics added.)
Having learned that his client was a potential prosecution witness in a capital murder case, West’s appointed counsel in Santa Monica also contacted Detective Collette to see “if he could help . . . with my case.” West’s former counsel states that he requested and received from Detective Collette a letter outlining West’s cooperation in the Maxwell murder investigation. This letter, dated August 6, 1982, and signed by Detective Collette, stated that the Long Beach authorities “would appreciate any consideration that could be given to Mr. Joseph Louis West concerning the charges against him." (Italics added.) The letter continued: “Mr. West earlier this year provided our Homicide Detail with information sufficient enough to initiate murder and robbery charges in the case of People vs. Morrison [s/c].” The letter further indicated that the case against defendant would probably “never have been solved without Mr. West’s assistance,” and noted that West had agreed to testify against Morris “in the near future.”
Later, Detective Miller also drafted a letter on West’s behalf. This letter, dated October 7, 1982, and signed by the Acting Chief of Police of Long *27 Beach, was addressed to the parole board. The letter outlined West’s cooperation in the Maxwell murder investigation and closed with a request that the board consider terminating West’s previously imposed sentence to state prison for parole violation.
Defendant’s preliminary hearing commenced on October 8 and continued on October 13, 1982. Joe West testified on the 13th. West states in his declaration that he spoke with the deputy district attorney in charge of defendant’s case before his testimony. According to West, the prosecutor “said if I testified against Morris, he would see to it that I would not do any prison time on my Santa Monica case, that the most I would do would be county jail time or time served.”
The former deputy district attorney who prosecuted defendant’s case, however, denies that he spoke with West prior to the preliminary hearing or made any offer of assistance in exchange for West’s testimony. In a declaration filed with this court, he states: “When Mr. West testified at the preliminary hearing against Mr. Morris, he had been promised nothing by me or anyone else in the District Attorney’s Office.” The prosecutor does acknowledge, however, that he informed West’s attorney “that West ought to receive something for his testimony.” As he explains: “I represented to [West’s attorney] that after the preliminary hearing I would in all probability make a recommendation to the District Attorney’s Office as to the disposition of the Santa Monica case . . . because Mr. West might be subject to violence in jail ... for his cooperation, and because in coming forward he had done a service for the community . . . [West’s attorney] agreed that he would not inform Mr. West of my representation, and would in no way suggest to Mr. West that he might receive something in exchange for his testimony.”
West’s testimony at the preliminary hearing was substantially the same as his later trial testimony, and tracked the information that he had first given the police in January 1979 and later repeated in June 1982.
Following the preliminary hearing, the prosecutor sent a letter, dated October 8, 1982 (the letter had apparently been drafted one week before it was actually mailed), to the deputy district attorney who was handling West’s case in Santa Monica. The letter stated that without Joe West’s “testimony and cooperation there would be no case against Morris.” The letter continued: “Although no promises were made by either our office or by the investigating agency, the Long Beach Police Department, I believe some form of reward ought to be made to Mr. West.” (Italics added.) The letter specifically recommended that West be permitted to plead guilty, placed on formal probation, and “released forthwith.”
*28 Several weeks later, the prosecutor wrote another letter, dated October 25, 1982, to the parole board. The letter stated that West had been “instrumental” in solving the Maxwell murder case and concluded: “Nothing was promised Mr. West for his testimony but it seems to me some reward ought to be made to encourage help of this sort in the future.” (Italics added.)
Several days later, the prosecution’s efforts on behalf of Mr. West paid off. On October 27, 1982, the Board of Prison Terms met in a special session to consider the “[a]dditional information received from the Long Beach Police Department of a confidential nature,” and the next day recommended that the one-year sentence imposed on West for the parole violation be modified to time served.[12]
Within a week of the parole board’s decision, a negotiated disposition was reached in the Santa Monica case. On the People’s motion, count I (grand theft auto) was dismissed, West pleaded guilty to count II (felony joyriding) and the prosecutor recommended probation and time served. West’s attorney submitted to the court Detective Collette’s letter of August 6th and the deputy district attorney’s letter of October 8th. Despite expressed concern over West’s extensive prior criminal record and the absence of a probation report, the sentencing judge acceded to the district attorney’s recommendation and released West on time served and three years probation.
In a declaration filed with this court, defendant’s trial counsel, Mr. Slick, states that, although he reviewed both the prosecutor’s file and West’s Santa Monica case file, he does not recall reading or copying any of the letters written on behalf of West by Detectives Collette and Miller or the deputy district attorney. The People concede that the Collette letter of August 6th and the deputy district attorney’s letter of October 8th were inadvertently omitted from the prosecutor’s file; neither letter was revealed until one year after trial, at a postconviction hearing to augment the appellate record.
The People maintain, however, that both letters to the parole board—the October 7th letter drafted by Detective Miller and the October 25th letter from the deputy district attorney—were “presumably” contained in the prosecutor’s file and therefore theoretically subject to discovery. That presumption is emphatically denied by defendant’s trial counsel, who notes in his declaration that “[a]ny letter . . . which revealed law enforcement benefits conferred on Mr. West would have made a major impression on me as a potential source of impeachment for bias at trial.” The People’s “presumption” is further undermined by the fact that neither of the letters was *29 uncovered when the prosecutor first reviewed his file in preparation for the August 1984 postconviction hearing. Had either of the letters actually been in the file at that time, it is reasonable to assume that they would have been produced at the postconviction hearing together with the letters of August 6 and October 8. In fact, neither of the letters to the parole board was revealed until a second search of the prosecutor’s file in August 1987. It is therefore reasonable to assume that copies of both letters were placed in the file sometime between August 1984 and August 1987, but that neither was contained in the prosecutor’s file and subject to discovery before or during the trial.
In addition to the aforementioned letters and declarations, the posttrial record also contains a transcript of the August 24, 1984, postconviction hearing in which the prosecutor in charge of defendant’s case gave sworn testimony concerning his actions in this matter. The deputy district attorney explained that his primary goal had been “to have Mr. West appear to have been a clean, unbought witness . . . .” Accordingly, he took the “position that our office could not be seen to be giving Mr. West something for his intended testimony against Oscar Lee Morris . . . .” Nevertheless, he believed that his office had an “obligation to Mr. West ... to give him something for what he had done.” Therefore, the prosecutor informed West’s attorney that he would probably make some recommendation concerning the disposition of the Santa Monica felony charges, but elicited an agreement from counsel that he would not tell West “that he might get something in return for his testimony.”
Based on the foregoing facts and circumstances, defendant contends that he was denied due process of law as a result of (1) the prosecution’s failure to disclose the four letters which resulted in a favorable disposition of West’s parole violation and the Santa Monica felony charges, (2) Detective Collette’s allegedly false testimony that West had not asked for any “favor ... in cash or in kind” in return for his cooperation, and (3) the prosecutor’s knowingly false argument to the jury that West had not received any benefits in the handling of his criminal case in return for his testimony.[13]
It is well settled that the prosecution has a duty to disclose all substantial material evidence favorable to an accused. (People v. Phillips (1985) 41 Cal.3d 29, 46 [222 Cal.Rptr. 127, 711 P.2d 423]; People v. *30 Ruthford (1975) 14 Cal.3d 399, 406 [121 Cal.Rptr. 261, 534 P.2d 1341].)[14] That duty exists regardless of whether there has been a request for such evidence (In re Ferguson (1971) 5 Cal.3d 525, 532-533 [96 Cal.Rptr. 594, 487 P.2d 1234]), and irrespective of whether the suppression was intentional or inadvertent. (People v. Ruthford, supra, 14 Cal.3d at p. 406.) As the United States Supreme Court in the seminal case of Brady v. Maryland (1963) 373 U.S. 83, 87 [10 L.Ed.2d 215, 218, 83 S.Ct. 1194], succinctly stated: “[T]he suppression by the prosecution of evidence favorable to an accused . . . violates due process . . . irrespective of the good faith or bad faith of the prosecution.”
The duty to disclose evidence favorable to the accused extends to evidence which may reflect on the credibility of a material witness. (People v. Ruthford, supra, 14 Cal.3d at p. 406.) As this court stated in Ruthford, “(S)uppression of substantial material evidence bearing on the credibility of a key prosecution witness is a denial of due process . . . .” (Id. at p. 408.)
The duty to disclose evidence bearing on the credibility of a prosecution witness manifestly includes any promises or inducements that have been made to obtain the witness’s testimony. As we recently explained in People v. Phillips, supra, 41 Cal.3d at page 46, “[s]ince a witness’s credibility depends heavily on his motives for testifying, the prosecution must disclose to the defense and jury any inducements made to a prosecution witness to testify and must also correct any false or misleading testimony by the witness relating to any inducements.” (Italics added.)
In light of the foregoing principles, it is clear that the prosecution’s failure to disclose its efforts on West’s behalf constituted a violation of due process. Both Detective Collette’s letter of August 6th and the deputy district attorney’s letter of October 8th expressly recommended that West be rewarded with a lenient disposition of pending felony charges in return for his cooperation in the Maxwell murder investigation and his testimony at the preliminary hearing. Both letters were introduced at West’s sentencing hearing and proved to be instrumental in West’s receiving a time-served disposition. Yet neither letter was ever made available to defense counsel for use as impeachment evidence at trial.
*31 It is also undisputed that letters drafted by Detective Miller and the deputy district attorney resulted in the parole board’s decision to terminate the state prison sentence which it had previously imposed as a result of West’s parole violation. The evidence indicates that neither letter was disclosed to defendant for use at trial.
Thus, the evidence leaves no room for doubt that defendant was wrongfully deprived of material evidence bearing on the credibility of the prosecution’s key witness, Joe West. (People v. Phillips, supra, 41 Cal.3d at p. 46.)
The Attorney General’s efforts to demonstrate that no error occurred are unpersuasive. It is argued that the evidence does not prove that West ever solicited, or that the prosecution ever offered, promises of leniency in exchange for testimony. According to Detectives Miller and Collette, they offered West assistance solely to allay his fear of defendant, not to induce his cooperation and testimony. West’s fear of plaintiff would have impelled him to testify, the People argue, regardless of whether he received benefits.
The People’s argument clearly misses the point. Obviously, the evidence as to precisely what representations were made to West, when they were made, and by whom they were made is conflicting and could support any number of inferences. Equally uncertain are the motives that actually induced West to testify for the prosecution. The resolution of these factual disputes, however, is not for us; these were preeminently questions for the jury. As we explained in Phillips, when it appears that offers of leniency were made in exchange for favorable testimony, and “ ‘there is a conflict in the evidence on this issue, it is up to the jury to resolve the conflict and then to judge the credibility of the prosecution witness accordingly(41 Cal.3d at p. 47, quoting People v. Westmoreland (1976) 58 Cal.App.3d 32, 47 [129 Cal.Rptr. 554], italics added.) What matters here is not how the jury might have resolved these questions; what matters is that they were never given that opportunity.
The People also suggest that no error occurred because the prosecution’s representations were vague rather than specific. According to Detectives Collette and Miller, they represented only that they would inform “the court in the Santa Monica case of [West’s] cooperation, and request any consideration that could be given him.” West’s trial prosecutor has also stated that he never informed West of his plan to intercede with the Santa Monica authorities, but rather informed West’s attorney on condition that the latter not reveal the possibility of such assistance to his client. Indeed, West concedes that he never actually saw the letters written on his behalf until after the trial.
*32 In short, the People argue that if West was unaware of the specific recommendations of leniency made on his behalf, those recommendations could not have served as an inducement for his testimony, and their disclosure could not have reflected adversely on his credibility.
The argument is unpersuasive. Even if it were true that the prosecution offered only vague assurances of “consideration” rather than specific promises of assistance, the inducement would have been no less effective. We recently considered this precise issue in People v. Phillips, supra, 41 Cal.3d 29. In that case, the defendant was charged with the murder of one individual and the attempted murder of another. Defendant’s girlfriend, Sharon Colman, was also charged with murder. Colman agreed to testify against defendant at trial, creating the suspicion that Colman had made a deal with the prosecution. Accordingly, defense counsel moved to question the prosecutor and Colman’s attorney about the terms of such an agreement. Col-man’s attorney objected on the ground that even if there had been a deal, it had not actually been communicated to Colman. The trial court agreed, reasoning that the terms of any agreement not disclosed to Colman could not be relevant to her credibility.
We concluded otherwise. Full disclosure of any agreement between the prosecution and a witness or the witness’s attorney is required, we held, regardless of whether the witness has been fully informed of the agreement. As we explained: “If disclosure is not required, the defense will never learn whether the terms of the agreement itself suggest that the witness must have had some inkling of the arrangement—as would be the case, for example, if the promised leniency were dependent on the witness’ testifying in a particular manner. Consequently, . . .full disclosure of any agreement affecting the witness is required to ensure that the jury has a complete picture of the factors affecting the witness’s credibility.” (41 Cal.3d at p. 47, italics added.)
Indeed, it is precisely where the witness may not have been informed of the agreement that the need for full disclosure is most important. As we explained: “[T]he ‘tactical’ device of keeping a prospective prosecution witness in the dark about the terms of a deal that has been negotiated with his counsel suffers from an even more fundamental flaw than an impairment of defense discovery rights . . . . [fl] [U]nless the witness is informed both of the terms of the agreement and that his receipt of the benefit cannot be denied so long as he testifies fully and truthfully at the criminal trial, the witness cannot help but believe that his own treatment will depend on how ‘well’ he does .... Consequently, a prosecutor’s insistence that the witness not be informed of the terms of the bargain has the inevitable tendency to lead the witness to color his testimony, so as to receive the most favorable *33 treatment from the prosecutor. No legitimate public interest is served by such a practice.” (41 Cal.3d at pp. 47-48, original italics.)
Thus, regardless of how imprecise or indirect the prosecution’s representations of assistance were in this case, their nondisclosure constituted a clear denial of due process.
The nondisclosure was compounded, moreover, by the district attorney’s affirmative representation to the jury that West had not received any benefits in return for his testimony. As earlier noted, the prosecutor stated: “Mr. Slick implies or certainly asks you to infer that Mr. West is getting something for his testimony here .... [T]here is no evidence, not a shred, and you would have it if it existed, if Mr. West got any benefit from this, that is, in the handling of his criminal case.”
This statement was patently misleading; West had unquestionably received “benefit[s] ... in the handling of his criminal case.” The prosecutor himself had a hand in that. Hence, the People not only failed to disclose evidence that Joe West had received substantial benefits from the prosecution, but affirmatively misled the jury to believe that such evidence did not exist.
The People respond that the district attorney’s statement was, in fact, accurate—that West received no consideration for his trial testimony because the parole violation and the Santa Monica charges had been favorably disposed of nearly a year earlier, following West’s preliminary-hearing testimony. Therefore, the People argue, there was no remaining inducement for West to testify at trial.
The argument is not persuasive. West clearly had a continuing incentive to provide testimony favorable to the prosecution at trial; had he recanted his earlier preliminary-hearing testimony, he would have been subject to prosecution for perjury. Moreover, West could have reasonably believed that he owed an ongoing debt to the prosecution in return for his freedom.
Defendant also contends that the People erred in failing to clarify Detective Collette’s testimony that West had never asked for “any favor or remuneration or payment in either cash or in kind.” In his posttrial declaration, Detective Collette has acknowledged that West’s attorney had “contacted me seeking assistance for Mr. West.” In the context of a criminal prosecution, client and counsel are essentially synonymous. Therefore, although Detective Collette may, in fact, have been telling the truth when he stated that West himself had not asked for any favors (West contends otherwise), his testimony was clearly misleading. As we stated in People v. *34 Phillips, supra, the prosecution must not only disclose any inducements made to a prosecution witness, but “must also correct any false or misleading testimony by the witness relating to any inducements.” (41 Cal.3d at pp. 46-47, italics added.) That duty plainly applied to Detective Collette’s testimony as well as to West’s.
The question remains whether the foregoing events were so prejudicial as to require reversal. Although we thoroughly condemn the prosecutorial misconduct disclosed by the record, we conclude that reversal of the judgment of guilt is not warranted. Though candid disclosure of the prosecution’s efforts on West’s behalf would have permitted a stronger attack on West’s credibility, the record discloses that West’s credibility was exposed to substantial impeachment. The prosecutor began his direct examination of West with a litany of the latter’s prior convictions. West admitted to convictions for burglary, robbery, grand theft, and rape. When the prosecutor asked if there were “[a]ny other felony convictions that you can think of?”, West replied, “There have been so many I don’t remember.” On cross-examination, defense counsel helped to refresh West’s memory, reviewing in detail each of defendant’s prior arrests and convictions; these included numerous arrests for burglary and theft as a juvenile, as well as convictions for auto burglary in 1963, grand theft and rape in 1964, grand theft in 1966, grand theft and robbery in 1967, robbery in 1975, burglary in 1977, burglary in 1978, grand theft in 1979, burglary in 1980, attempted burglary in 1981, and finally the arrest for grand theft in 1982 which resulted in West’s call to Detective Collette.
In addition, West candidly acknowledged that he harbored a lethal animus against defendant stemming from the Bruce Thompson incident, and admitted that he had once made an attempt on defendant’s life.
Furthermore, while it is clear that defendant’s admissions as reported by West were critical, those admissions were strikingly in accord with the independent and uncontroverted facts of the murder itself. West knew that the killing had occurred in a bathhouse off the beach, he knew the precise location of the bathhouse, he knew that the killing involved a White homosexual, and he gave the police a revolver which was consistent with the murder weapon—a revolver which, according to West, defendant said he had used to kill a “white boy” at a bathhouse in Long Beach. The jury knew that West himself could not have committed the murder, since he was incarcerated at the time, and there was no evidence that these details of the murder could have been ascertained anywhere else. The only possible source of the information was defendant.
West’s testimony was corroborated by other evidence, as well. The eyewitness to the shooting, Verner Billdt, stated that defendant resembled the *35 assailant in race, build, height and weight. Mr. Billdt saw the assailant flee from the scene in a yellow Toyota compact. Defendant’s former girlfriend, who lived in Long Beach and owned a yellow Toyota compact, testified that defendant had access to her car on the date of the murder. In addition, three days after the murder, a man presented a credit card which had been loaned to the victim; defendant was identified in a photographic identification and at trial as looking like the man who tried to use the card.
Given the considerable amount of impeachment evidence presented against West, as well as the independent corroboration of West’s testimony, we are persuaded that the nondisclosure in this case could not have affected the result and does not, therefore, compel reversal. (Bagley v. United States, supra, 473 U.S. at p.677 [87 L.Ed.2d at pp. 490-491].)
E. References to Defendant’s Silence
Defendant next contends that the prosecutor improperly commented on his failure to testify in violation of Griffin v. California (1965) 380 U.S. 609 [14 L.Ed.2d 106, 85 S.Ct. 1229].
Under the rule in Griffin, error is committed whenever the prosecutor or the court comments, either directly or indirectly, upon defendant’s failure to testify. It is well established, however, that the rule prohibiting comment on defendant’s failure to testify “does not extend to comments on the state of the evidence or on the failure of the defense to introduce material evidence or to call logical witnesses.” (People v. Szeto (1981) 29 Cal.3d 20, 34 [171 Cal.Rptr. 652, 623 P.2d 213].)
Defendant did not testify at the guilt phase of trial, nor did he offer any alibi evidence as to his whereabouts on the day of the murder. During closing argument, the prosecutor argued in pertinent part:
“Everything comes together. The bits of the puzzle come together to fit the point of Mr. Morris. And nothing points at anybody else.
“Keep in mind that there is not a shred of evidence. Not a shred to suggest that anybody else did the killing, other than Oscar Lee Morris. Not a shred.
“There is not a shred of evidence to indicate that Oscar Morris was anywhere else on the morning of September 3, 1978.
“Nothing. Put yourself in the position of being a defendant, and you can bet your boots that if you had anything to offer by way of evidence, by way *36 of alibi, that you would offer it. Be assured of that. Be assured of the fact that any defense attorney would make sure that if any such evidence existed, you would have it. You don’t have it.
“There is nothing, nothing to gainsay Mr. West, Mr. Billdt, Mr. Johnson, and all of this evidence comes directly at Oscar Morris.”
At the conclusion of the prosecutor’s argument, defense counsel approached the bench and moved for a mistrial on the ground that the district attorney had improperly referred to defendant’s silence. The prosecutor responded that he had merely referred to the lack of defense evidence, not to defendant’s failure to testify. The trial court denied the motion.
The trial court’s ruling was correct. The deputy district attorney’s comment that there was “not a shred of evidence to suggest that anybody else did the killing” clearly referred to the state of the evidence. It contained no reference—express or implied—to defendant’s silence, and therefore was not objectionable. (People v. Vargas (1973) 9 Cal.3d 470, 475-476 [108 Cal.Rptr. 15, 509 P.2d 959]; see People v. Ratliff (1986) 41 Cal.3d 675, 691 [224 Cal.Rptr. 705, 715 P.2d 665] [Griffin principles not violated by prosecutor’s remark that “[absolutely zero [evidence] has been presented to you by Mr. Ratliff and his attorney . . . .”].)
The prosecutor’s other remarks were equally inoffensive. As noted above, the prosecutor invited the jury to “put yourself in the position of being a defendant and you can bet your boots that if you had anything to offer by way of evidence, by way of alibi, that you would offer it.” Defendant argues that this remark could have been interpreted as a reference to defendant’s personal failure to take the stand. Again, however, the prosecutor’s remarks were properly confined to the absence of “evidence” or “alibi”; there was no reference, indirect or otherwise, to defendant’s failure to testify in his own behalf.
The same is true of the prosecutor’s comment that there was no evidence to “gainsay Mr. West, Mr. Billdt, Mr. Johnson . . . .” Defendant argues that, as a practical matter, there was no one in a position to “gainsay” Mr. West’s testimony concerning defendant’s alleged admissions other than defendant. However, by couching the statement in general terms (“There is nothing, nothing to gainsay Mr. West . . .”), the prosecutor made it clear that he was remarking on the general state of the evidence, not on defendant’s failure to testify in his own behalf; the possibility of an impermissible inference is simply too remote to find error.
We conclude the prosecutor’s argument did not violate Griffin principles (supra, 380 U.S. 609).
*37 F. Precharging Delay
Defendant made a pretrial motion to dismiss, claiming the four-year delay between the occurrence of the offense and the filing of the information denied him his right to a fair trial. We conclude that the motion was properly denied.
An unreasonable delay between the time an offense is committed and an accusatory pleading is filed may violate a defendant’s right to a fair trial and due process of law under article I, section 15, of the California Constitution and the Fifth and Fourteenth Amendments to the United States Constitution. (Scherling v. Superior Court (1978) 22 Cal.3d 493, 504-505 [149 Cal.Rptr. 597, 585 P.2d 219].) In evaluating a claim of precomplaint delay, “any prejudice to the defendant resulting from the delay must be weighed against justification for the delay.” (Scherling, supra, 22 Cal.3d at p. 505.) “In the balancing process, the defendant has the initial burden of showing some prejudice before the prosecution is required to offer any reason for the delay [citations]. The showing of prejudice requires some evidence and cannot be presumed. [Citations.]” (Garcia v. Superior Court (1984) 163 Cal.App.3d 148, 151 [209 Cal.Rptr. 205]; see also United States v. Lovasco (1977) 431 U.S. 783, 790 [52 L.Ed.2d 752, 759, 97 S.Ct. 2044]; People v. Archerd (1970) 3 Cal.3d 615, 639-640 [91 Cal.Rptr. 397, 477 P.2d 421]; Ibarra v. Municipal Court (1984) 162 Cal.App.3d 853, 857-858 [208 Cal.Rptr. 783].) Prejudice may be shown by loss of material witnesses due to lapse of time (People v. Hughes (1974) 38 Cal.App.3d 670, 676-677 [113 Cal.Rptr. 508]) or loss of evidence because of fading memory attributable to the delay. (People v. Archerd, supra, 3 Cal.3d at p. 640.)
At the hearing on defendant’s motion, the People stipulated that by January of 1979, the Long Beach police had learned that Joe West possessed certain information implicating defendant in the murder; that Mona Harrison, defendant’s girlfriend, owned a yellow Toyota similar to the car in which the suspect had fled; and that Calvin Johnson had tentatively identified defendant from a photographic lineup.
By late January or early February of 1979, therefore, it would appear that the Long Beach police were close to a reasonable basis for charging defendant. Shortly thereafter, however, the case file was inadvertently placed in the archives as a closed case and no further investigation was undertaken until June 1982, three and one-half years later, when Joe West again came forward with information which implicated defendant.
Defendant contends that the three-year delay attributable to the loss of the file critically undermined his ability to present an alibi defense. *38 Defendant cites three specific instances of prejudice: 1) the testimony of Mona Harrison, who stated that she could not recall whether defendant or anyone else had used her yellow Toyota on the day of the murder, 2) defendant’s testimony during the penalty phase of trial, in which he stated that he could not recall his whereabouts on the day of the murder, and 3) the prosecutor’s closing remarks which highlighted defendant’s lack of an alibi defense.
The record does not support defendant’s contention. Mona Harrison testified at the hearing on the motion to dismiss that her recollection of the events of September 3, 1978, was no better in February 1979, when she first spoke to the police, than it was four years later, when the investigation resumed. Defendant’s claim that his own memory had faded was speculative at best. And the prosecutor’s reference to the lack of an alibi did not deny defendant the opportunity to present an effective defense and was not fundamentally unfair.
Therefore, we conclude the trial court did not abuse its discretion in denying defendant’s motion to dismiss for precomplaint delay.
G. The Prior Homicide
Defendant contends the trial court erred in admitting evidence that defendant had committed a prior homicide.
To recall the pertinent facts: During the cross-examination of Joe West by defense counsel, West admitted that he had attempted to kill defendant with a blast from a sawed-off shotgun. Following this admission, defense counsel moved to prohibit the district attorney from inquiring any further on redirect examination into the events surrounding the incident. Defense counsel explained that he wanted to prevent West from testifying as follows: that shortly after the shooting, West returned to defendant’s house with a friend named Bruce Thompson; that West and Thompson then exchanged jackets; and that Thompson thereupon entered defendant’s house, where he was shot and killed by defendant. In the same motion, defense counsel sought to exclude evidence relating to defendant’s prior conviction of the murder of one Earl Sesson.[15]
The trial court excluded all evidence relating to the murder of Sesson, but ruled that evidence of the Thompson killing was admissible to “corroborate the fear and the reason for the shooting of\defendant\ by Mr. West. ” Defense *39 counsel thereupon continued his cross-examination of Joe West, eliciting the story of the Thompson killing himself rather than leaving it to the district attorney to educe.
In People v. Zemavasky (1942) 20 Cal.2d 56, 63 [123 P.2d 478] we held it to be an “ ‘unquestioned rule of evidence that when any witness admits bias and prejudice on cross-examination, on redirect the reasons for such prejudice cannot be gone into, at least where such reasons involve other alleged offenses outside the issue. ’ ” (Italics added.) In that case, the prosecution called a rebuttal witness to testify that defendant’s reputation for truth and morality was bad. On cross-examination, the witness candidly admitted that she was prejudiced against defendant. On redirect examination, the witness was permitted to explain, over objection, that her prejudice was based on the fact that defendant had failed on several occasions to support his wife and family. (20 Cal.2d at pp. 62-63.)
We held the admission of such evidence was clearly erroneous, noting that settled law prohibited the rehabilitation of an admittedly prejudiced witness. (20 Cal.2d at p. 63.) As we explained: “The reason for the rule is obvious. When the defendant is able to prove that a prosecution witness is prejudiced if that witness could then explain the reason for the prejudice by stating that he knows about other wrongful acts, it would bring into the case all kinds of extraneous and unrelated offenses not relevant to the issue, and would permit the prosecuting attorney to do indirectly what he cannot do directly.” (20 Cal.2d at p. 63; accord People v. Mullen (1953) 115 Cal.App.2d 340, 344 [252 P.2d 19] [“Where cross-examination has shown bias or prejudice on the part of the witness he cannot be rehabilitated by showing his bias to be justified.”]; People v. Pierce (1969) 269 Cal.App.2d 193, 205 [75 Cal.Rptr. 257] [“Once a witness has admitted bias, the court should not permit his rehabilitation by inquiry into the causes by which he justifies his bias.”]
In light of the foregoing principles, the admission of defendant’s prior homicide was erroneous. The purpose of the evidence was, in the trial court’s own words, “to corroborate the fear and the reason for the shooting of [defendant] by Mr. West.” Thus, the evidence was admitted to explain West’s previously admitted bias against defendant. This was improper under Zemavasky.
The error does not, however, compel reversal of the judgment of guilt. As earlier discussed, West’s testimony and the circumstantial evidence in corroboration thereof presented an airtight case of guilt. Defendant offered no persuasive evidence in rebuttal. Hence, we perceive no reasonable probability that the evidence of the Thompson killing affected the result.
*40 H. The Instruction on Possession of Stolen Property
Defendant contends the trial court erroneously instructed the jury, pursuant to CALJIC No. 2.15, that defendant’s “conscious possession of recently stolen property . . . [while] . . . not enough to justify his conviction ... is, however, a circumstance to be considered in connection with other evidence.”[16] Defendant argues that there was insufficient evidence to show either that he was in “possession” of property, or that the property was “stolen,” to justify the reading of the instruction.
The quantum of evidence sufficient to warrant the giving of such an instruction has not been a subject of extensive analysis in the case law. It is clear, however, that where the evidence relating to “possession” is conflicting or unclear, an unqualified instruction pursuant to CALJIC No. 2.15 should not be given, for it could easily mislead the jury into assuming that the defendant’s possession has been established when, in actuality, the issue is in doubt. For example, in People v. Rubio (1977) 71 Cal.App.3d 757 [139 Cal.Rptr. 750] (disapproved on other grounds in People v. Freeman (1978) 22 Cal.3d 434, 438 [149 Cal.Rptr. 396, 584 P.2d 533]), the only evidence of possession was the fact that $100 in stolen cash was found near the defendant. On these facts, the Court of Appeal concluded that, “defendant’s possession of this money could not be presumed to justify the giving of CALJIC No. 2.15.” (Id. at p. 768.) Moreover, the Rubio court observed, the giving of the unwarranted instruction may have led the jury to “assume[ ] that the evidence established, without dispute, defendant’s possession of stolen property . . . [when] . . . [i]n actuality . . . this was an open question.” (Ibid.)
Although apparently no court has ever considered the matter, it would appear that the same principle should govern when the factual uncertainty concerns the status of the property as stolen. The operative principle is the same. Where the question is open, an unqualified instruction on possession of “stolen property” might lead the jury to assume that the issue has actually been settled.
In this case, the only evidence of defendant’s possession of stolen property was Calvin Johnson’s testimony that defendant was the man or “looked like” the man who presented the Sears card which had been loaned to the *41 victim. Assuming that this evidence provided a sufficient basis to presume possession (People v. Rubio, supra, 71 Cal.App.3d at p.768), the issue of whether the property had been “stolen” from the victim was clearly an open question. Hence it would have been advisable not to render CALJIC No. 2.15 without modification. However, jury instructions must be considered as a whole. (Douglas v. Southern Pacific Co. (1928) 203 Cal. 390, 396 [264 P. 237]; Redevelopment Agency v. First Christian Church (1983) 140 Cal.App.3d 690, 705 [189 Cal.Rptr. 749].) Here, the trial court concluded its instructions to the jury by cautioning that none of its rulings or instructions should be construed “to intimate or suggest what you should find to be the facts ....[][] If anything I have done or said has seemed to so indicate, you will disregard it and form your own opinion.” The court further directed: “Whether some of the instructions will apply will depend upon your determination of the facts. []f] You will disregard any instruction which applies to a state of facts which you determine does not exist. [][] You must not conclude from the fact that an instruction has been given that the court is expressing any opinion as to the facts. ” In view of these additional cautionary instructions, there is no likelihood the jury was misled.
I. Exclusion of Jurors Opposed to the Death Penalty
Defendant contends that he was deprived of a fair trial as to guilt because two jurors who stated on voir dire that they would automatically vote against the death penalty were excused for cause. This argument has been rejected both by this court (People v. Fields (1983) 35 Cal.3d 329, 353, 374 [197 Cal.Rptr. 803, 673 P.2d 680], cert. den. (1984) 469 U.S. 892 [83 L.Ed.2d 204, 105 S.Ct. 267]) and more recently by the United States Supreme Court (Lockhart v. McCree (1986) 476 U.S. 162 [90 L.Ed.2d 137, 106 S.Ct. 1758]).
Conclusion
In Crim. No. 23427 the judgment is reversed as to count II (robbery) and the firearm-use finding on that count is set aside; on count I (murder), the special circumstance finding is set aside and the judgment is reversed as it relates to penalty; in all other respects, the judgment is affirmed. The case is remanded to the superior court for resentencing.
In Crim. No. 25305 the order to show cause is discharged, and the petition for habeas corpus is denied.
*42 Lucas, C. J., Mosk, J., Panelli, J., Anderson (Carl W.), J.,* and Barry-Deal (Betty), J.,† concurred.

 All further statutory references are to the Penal Code unless otherwise indicated.

 The crimes with which defendant was charged were committed on September 3, 1978. The law governing the penalty for this case is therefore to be found in sections 190 to 190.5 as enacted by the Statutes of 1977, chapter 316, sections 4 to 13, pages 1256 to 1262. Because these provisions were amended by initiative in the following year (Prop. 7, Gen. Elec. (Nov. 7, 1978)), all references thereto will be designated former section 190 et seq.

 As will be explained in more detail, defendant eventually pleaded guilty to voluntary manslaughter for the killing of Bruce Thompson and received a sentence of eight years in state prison.

 Defendant raised the statute of limitations issue for the first time on appeal. However, because the statute of limitations is jurisdictional, it may be raised at any time before or after judgment. (People v. Chadd (1981) 28 Cal.3d 739, 756-757 [170 Cal.Rptr. 798, 621 P.2d 837]; People v. Rehman (1964) 62 Cal.2d 135, 139 [41 Cal.Rptr. 457, 396 P.2d 913].)

 The information alleged that the robbery and murder were committed on September 3, 1978. The information was filed in October 1982, well beyond the three-year statute of limitations then applicable to robbery. Former section 800 has since been amended to provide for a six-year statute of limitations. (Stats. 1984, ch. 1270, § 1.)

 We are aware that a dictum in People v. Green, supra, 27 Cal.3d 1, indicates, contrary to our holding herein, that section 190.4 requires “a valid conviction of the underlying offense of kidnaping as a necessary condition to the jury’s finding of the kidnaping special circum *18 stance . . . .” (Id. at p. 74.) However, the precise issue in that case was whether the statute required proof of the constituent felony, not whether it required the defendant be charged with and convicted of the constituent felony as a separate, substantive offense. As to the latter issue, it is clear that it is not required by the statute that the constituent felony be charged as a separate, substantive offense or that the defendant be convicted of the constituent felony as a separate, substantive offense. In the context of the issue in Green the dictum was not erroneous, but in light of the issue here, it is apparent that the language used was overbroad.

 Defendant also cites the recent Court of Appeal decision in People v. Superior Court (Jennings) (1986) 183 Cal.App.3d 636, 641 [228 Cal.Rptr. 357] (review den. Oct. 23, 1986), which held that a felony-murder special circumstance is barred by the expiration of the statute of limitations applicable to the underlying felony. To the extent that Jennings is inconsistent with our holding herein, it is hereby disapproved.

 Evidence of a “taking” was scant, but was conceivably sufficient. The Sears credit card that Robert Hernandez had loaned the victim some two months prior to the killing was the only evidence that personal property may have been taken from the victim. Though there was no evidence that the card was ever recovered, one witness, Calvin Johnson, testified that a man who “looked like" defendant presented the card three days after the murder. On the record, however, any such taking could have been a simple theft or even consensual. There is no evidence of a taking by force or fear from the person of another.

 An intent to rob will not support a conviction of felony murder if it arose after the infliction of the fatal wound. (People v. Green, supra, 27 Cal.3d at p. 54, fn. 44; People v. Gonzales (1967) 66 Cal.2d 482, 486 [58 Cal.Rptr. 361, 426 P.2d 929].) As we held in section B, ante, page 1383 et seq., the evidence here was insufficient to show whether the murder was *24 ancillary to the robbery, if any, or the robbery, if any, was incidental to the murder. (People v. Green, supra, 27 Cal.3d at p. 60.)

 Under the 1977 death penalty statute, both findings were required to establish the special circumstance. (Former § 190.2, subd. (c)(3).)

 In 1979, defendant was charged with two counts of murder for the killing of Bruce Thompson and one Earl Sesson, each with a special circumstance and firearm use allegation. West testified for the prosecution at the preliminary hearing. Thereafter, pursuant to a negotiated plea, defendant pleaded guilty to voluntary manslaughter for the Thompson killing and second degree murder for the Sesson killing, and admitted both firearm use allegations. Defendant received the bargained-for sentence of the midterm of six years for second degree murder plus a two-year enhancement for the firearm use finding, and a concurrent sentence of six years for the manslaughter, for a total sentence of eight years in state prison.

 It is unclear whether the Board of Prison Terms had actually received the prosecutor’s letter of October 25 in addition to Detective Miller’s letter of October 7, when it met on October 27 to reconsider West’s sentence.

 Defendant also cites as error the prosecutor’s failure to clarify certain of West’s testimony during the. penalty phase of trial, where West stated that his sole motive for testifying against defendant was his sense that defendant had not been punished severely enough for the Thompson murder. Because we conclude that the penalty judgment must be reversed, we need not reach this additional contention.

 Relying on the recent United States Supreme Court decisions in Bagley v. United States (1985) 473 U.S. 667 [87 L.Ed.2d 481, 105 S.Ct. 3375] and Pennsylvania v. Ritchie (1987) 480 U.S. 39 [94 L.Ed.2d 40, 107 S.Ct. 989], the People argue that evidence is “material” only if there is a reasonable probability that its disclosure would affect the verdict. We read the high court’s discussion of materiality in Bagley and Ritchie, however, as going to the standard of review, not to the scope of the duty to disclose. As it is commonly understood, evidence is “material” which “tends to influence the trier of fact because of its logical connection with the issue.” (Black’s Law Diet. (5th ed. 1979) p. 881, col. 1.) Thus, the prosecution’s duty of disclosure extends to all evidence that reasonably appears favorable to the accused, not merely to that evidence which appears likely to affect the verdict.

 Primarily as the result of evidence supplied by Joe West, defendant had entered a negotiated plea of guilty and been convicted of voluntary manslaughter for the Thompson killing and second degree murder for the Sesson killing.

 The full instruction given to the jury was as follows: “The mere fact that a person was in conscious possession of recently stolen property is not enough to justify his conviction of the crimes charged in the information. “It is, however, a circumstance to be considered in connection with other evidence. To warrant a finding of guilty, there must be proof of other conduct or circumstances tending of themselves to establish guilt.”

 Presiding Justice, Court of Appeal, First Appellate District, Division Four, assigned by the Chairperson of the Judicial Council.

 Associate Justice, Court of Appeal, First Appellate District, Division Three, assigned by the Chairperson of the Judicial Council.