[Crim. No. 4378. In Bank. Mar. 24, 1942.]

THE PEOPLE, Respondent, v. NICK ZEMAVASKY, Appellant.

James F. Brennan and Saul Perlis for Appellant.

Earl Warren, Attorney General, Dennis Hession, William F. Cleary and David K. Lener, Deputies Attorney General, Matthew Brady, District Attorney, and John R. Golden, Assistant District Attorney, for Respondent.

THE COURT.—The appellant was convicted of statutory rape allegedly perpetrated upon his seventeen-year-old stepdaughter. Upon this appeal from the judgment and order denying a new trial he contends that the evidence is insufficient to support the verdict; that the trial court committed prejudicial error in certain rulings on the admissibility of evidence and in the giving and refusing of instructions; and that the district attorney was guilty of prejudicial misconduct. The reply brief filed by the attorney general, when the cause was pending before the District Court of Appeal, merely served to accentuate the appellant's contentions. It submitted the case without argument, declaring that "it appears that the evidence against appellant was not overly credible." However, the District Court of Appeal affirmed the judgment of conviction, one justice dissenting. Thereafter, upon petition, a hearing was granted in this court. Heartened apparently by the majority decision of the appellate court, the Attorney General has since filed in this court a brief in which he now vigorously challenges appellant's contentions and in which it is argued that the record contains adequate substantial and trustworthy evidence to support the conviction. We have examined the record. While we may not declare the story of the prosecutrix to be wholly improbable, the presence of inconsistencies and contradictions therein, coupled with the unusual delay in reporting the asserted attack upon her, serves to detract materially from its persuasiveness. These matters, when considered with appellant's denial at all times that he had perpetrated the attack charged against him, much of his testimony being corroborated by his wife, the mother of the prosecutrix, require a conclusion that the errors to be hereinafter referred to must be held to have been prejudicial to appellant.

Appellant is a contracting painter. In 1932 he married the mother of the prosecutrix in San Francisco, and thereafter lived with his wife and stepdaughter. The girl had known appellant since she was seven years old. She testified that he had been having sexual relations with her since she was twelve years old. The criminal act of which he was convicted, however, was committed, so the prosecutrix testified, on May 29, 1939. At that time Mrs. Zemavasky was visiting relatives in Poland and, according to her testimony, she had gone there because of the illness of her father. She left San Francisco on May 6, 1939, and, before leaving, at the suggestion of ap-

pellant, she had arranged for her daughter, who was attending high school, to live with a friend. In response to inquiry, the mother of the prosecutrix testified that appellant suggested that the prosecutrix live elsewhere during the mother's absence in Europe "because he knows she has been already like this and he don't want to keep her home." On cross-examination by the prosecution, the friend with whom the prosecutrix was left during her mother's absence, and who was paid $40 a month for the maintenance of the prosecutrix, testified that she told the mother, "If you go to Europe maybe something happen. I am afraid about daughter, I know she has that boy." Against her mother's wishes the girl had been keeping company with a young man and on May 23, two and one-half weeks after the mother's departure, they ran away to Redwood City and were married. Following the marriage they went to Long Beach and there visited the boy's aunt. She refused to believe they were married and caused them to be taken into custody by the juvenile court authorities. That same night the police telephoned to the boy's grandmother, Mrs. Pagel, and upon being informed by her that the couple had been married the police stated they would be released. At Mrs. Pagel's request, however, the police consented to hold them until arrangements could be made to return them to San Francisco. Immediately upon receiving the telephone message Mrs. Pagel communicated with appellant and, at her request, he called at her home. Mrs. Pagel and appellant agreed to send the necessary money to bring the couple back to San Francisco. They did so, and the couple arrived in San Francisco by bus about five o'clock on the morning of May 29th. They went to Mrs. Pagel's home, where they met, among others, Mrs. Pagel and appellant, and the question was discussed as to whether the couple wanted to continue living together. There was discussion of an annulment. Appellant took the girl home with him, so that he could talk with her alone. Upon reaching their home, the prosecutrix went to her bedroom to collect some clothing to take with her. She testified that in about five minutes appellant entered the room, and, under threats of violence and that he would turn her over to the juvenile authorities, compelled her to have sexual intercourse with him. Later that morning he drove the girl back to Mrs. Pagel's home and, upon leaving her there, stated to Mrs. Pagel that the girl wanted to live with her husband. Mrs. Pagel noticed that the girl had been crying, which con-

dition could have resulted from a discussion directed at an annulment of the marriage. At any rate, no charge was then made against appellant, although there were several persons present to whom the girl could have complained.

Appellant denied having had sexual relations with the girl at any time and denied having gone to her room at all on the morning of May 29th. He testified that after they entered the home she went to her room; that he prepared breakfast, which they ate; and that soon afterwards he drove her back to Mrs. Pagel's home. The girl admitted having breakfast with appellant after the alleged assault. Appellant produced a corroborating witness, a friend of some twenty-five years' standing, who testified that he was spending the weekend with appellant, and that he had accompanied appellant to Mrs. Pagel's home the night she received the telephone message from the police. The witness testified that he was sitting in the living room of appellant's home, reading a paper, when appellant and the girl arrived on the morning of May 29th; that from where he sat in the living room he could see whether anybody went in or out of the girl's bedroom; that he saw the girl go into the bedroom, but that she did not see him; and that appellant did not at any time enter her room that morning. The prosecution challenged the credibility of this witness. In this regard Mrs. Pagel and her daughter testified that the witness was not the man who came to their home with appellant on the night in question. Moreover, the prosecutrix testified that no one besides appellant and herself was present in the house that morning and that if any one had been sitting in the living room she could and would have seen him. In considering the accuracy of her report of this incident, certain discrepancies in other portions of her testimony may be considered. There is a conflict, for instance, between the testimony given by the girl at the trial as to when she told her husband about appellant having assaulted her and the testimony given by her in that respect at the preliminary examination. Appellant was not formally charged with the commission of the offense until March, 1940, some ten months after its asserted occurrence. Delays in filing charges of this kind are looked upon as a weakness in the prosecution's case and may be considered in weighing any errors upon the trial.

After the asserted commission of the offense, and prior to any charge against appellant, the prosecutrix accepted gifts from her mother and appellant on her eighteenth birthday in

September, 1939, and on the following Christmas they exchanged gifts. In the ten-month period between the asserted offense and the arrest of appellant, the prosecutrix occasionally visited her mother and saw and talked with appellant. Admittedly, during this period she never mentioned the matter to her mother or to any one else except her husband. At the trial she testified that she told her husband about July 4, 1939, but, in spite of this, the parties exchanged Christmas gifts that year.

There was evidence offered by the defense tending to indicate that the prosecutrix had been carrying on intimate relations with the boy prior to their marriage. The landlady where the boy roomed testified that the prosecutrix spent much time in the boy's room and that unusual noises emanated therefrom. Upon inquiry, they told her they were married. At the time, this was not so. Upon the trial, both denied any such improper relations but admitted falsifying as to their then marital status. However, the mother of the prosecutrix testified that after the matter had come to her attention she remonstrated with the prosecutrix and threatened to place her in the detention home, whereupon the girl admitted that she had been living with the boy for six months and promised to cease such relations if not placed in the detention home. Appellant and his wife, the mother of the prosecutrix, also testified that prior to the filing of the charge against appellant the girl and her husband had tried to obtain money from them. This the young couple denied. The evidence is clear, however, that the boy was earning little, if any, money at the time. Although there is some conflict in that respect, there is evidence indicating that early in 1940 the relationship between the prosecutrix and her mother was becoming strained. Upon the mother's return from Poland she was considerably disturbed to learn of the marriage of the prosecutrix during her absence, her disappointment being reflected in her actions toward the couple. There is evidence also tending to indicate that the prosecutrix and her husband felt that the former was entitled to a fund which had been promised her by her mother and appellant for her education. As stated in *People* v. *Gump*, 17 Cal. App. (2d) 221 [61 P. (2d) 970], "grave suspicion is cast upon the story when it is shown that it was only told after the trouble had arisen" between the parties. Such suspicion and any contradictions or weaknesses in the story of the prosecutrix require that close examination

be made of any errors committed upon the trial. An appellate court is not only permitted to, but must, consider the state of the evidence in determining whether errors are prejudicial. In a close case, such as this, any error of a substantial nature may require a reversal and any doubt as to its prejudicial character should be resolved in favor of the appellant.

In the light of the entire circumstances disclosed by the record, we now direct ourselves to what we consider to have been prejudicial errors committed upon the trial. Evidence was produced by the prosecution, over objection, tending to show that appellant was probably not married to a prior wife; that the three children of that marriage were probably illegitimate; and that appellant had been frequently charged with non-support of those children. This evidence could have no purpose other than to blacken the reputation and character of appellant without in any manner tending to prove any of the elements of the crime of which appellant stands convicted. This, in our opinion, constituted an attempt to impeach appellant, and perhaps his wife, the mother of the prosecutrix, who appeared as a defense witness, by evidence of particular wrongful acts, in violation of section 2051 of the Code of Civil Procedure.

It is no sufficient answer to urge that this or similar evidence was presented without objection when appellant was under cross-examination by the prosecution. We are cognizant of the rule that error in the admission of evidence is harmless if the fact involved is proved by other evidence which is admitted without objection. The rule, however, is not applicable where, as here, the prosecution, over appellant's objection, at an earlier stage of the trial was permitted to cross-examine appellant's wife as to appellant's children by another woman. In view of the earlier rebuff, it was not thereafter incumbent upon appellant to object repeatedly to such evidence when later sought to be elicited by the prosecution. Objection, under the circumstances, would have been useless and would have served only to emphasize the matter to the jurors.

The error and resulting prejudice were magnified many fold, in our opinion, when the prosecution later produced a municipal judge of San Francisco as a rebuttal character witness. We agree with what Presiding Justice Peters said in his dissenting opinion with respect to this episode when the cause was before the appellate court. He stated:

''After testifying that defendant's reputation for 'truth, honesty and integrity, morality and upright living' was 'bad', she was cross-examined by defendant's counsel. He properly brought out the fact that she was prejudiced. She admitted that she knew nothing about the facts of the case then on trial; that she was 'very much prejudiced against Mr. Zemavasky' and admitted telling counsel for defendant that she 'hoped this man would go to San Quentin.' Then on redirect examination, over defendant's objections, she was permitted to answer the question, 'On what, Judge, do you base that hope?' She replied, 'Well, I met Mr. Zemavasky in the court charged with omitting to provide for three minor illegitimate children. I knew his former wife, and that he had gone through a service that was not a marriage and then left her with these three children. I made every effort to collect money from him for those three children and to no avail; I made arrangements with him to come to my office at the City Hall; he never kept it, and those three children had to be taken care of by the City and County of San Francisco.' She was the last witness. The question and answer were not only improper because they tended to bring out evidence of other wrongful acts, but also because it is an unquestioned rule of evidence that when any witness admits bias and prejudice on cross-examination, on redirect the reasons for such prejudice cannot be gone into, at least where such reasons involve other alleged offenses outside the issue. The rule, supported by many cases, is stated as follows in 70 C. J. p. 1007, §1217: '. . . nor does the witness' unqualified admission of ill will open the door to proof of the reasons therefor, especially where such reasons involve other alleged offenses outside the issue . . .' The reason for the rule is obvious. When the defendant is able to prove that a prosecution witness is prejudiced if that witness could then explain the reason for the prejudice by stating what he knows about other wrongful acts, it would bring into the case all kinds of extraneous and unrelated offenses not relevant to the issue, and would permit the prosecuting attorney to do indirectly what he cannot do directly. Exactly the same problem involved in the instant case was presented in *Sneed* v. *State,* 40 Ariz. 441 [14 P. (2d) 248]. At page 249 the court stated: 'The reason why the witness was hostile towards appellant was not a proper subject for either direct or redirect examination by the prosecution. The elicitation by the appellant of the witness' ill feel-

ing toward him did not open the door to proof by the prosecution that such ill feeling was the result of criminal acts of appellant against the witness. Otherwise it would be most dangerous to cross-examine a witness as to his bias and prejudice towards the accused, for, if such reason may be given, all kinds of extraneous and unrelated offenses might be detailed to the jury, so that the trial would be not of the particular offense charged but of many offenses not charged. The court should have sustained the appellant's objection on the ground of the incompetency of the testimony to prove any issue of the case.' ''

The factual situation here presented is distinguishable from that involved in any of the cases cited by the Attorney General as pointing to the propriety of the ruling admitting the challenged evidence. Here, the defense on cross-examination did not elicit from the witness evidence merely tending to show a possible bias or prejudice against appellant. Instead, on cross-examination, the witness frankly admitted that she was ''very much prejudiced'' against appellant. In the light of such positive declaration of prejudice by the witness, no amount of discussion or explanation by her on redirect examination as to the reasons or causes underlying such frame of mind could have any tendency to counteract her testimony on cross-examination or tend to indicate an absence of prejudice against appellant. On the contrary, it served only to bring before the jury extraneous matters prejudicially harmful to appellant.

The principle is stated in 3 Wigmore on Evidence 511, section 952(2), as follows: ''When to a witness is imputed hostility to the opponent, the true process of explanation consists in showing that the facts offered do not really indicate the conclusion suggested, *i. e.*, the hostility. Thus, when the counter-evidence does not attempt to do this, but admits the hostility and desires to show that it was *justifiable by the opponent's conduct,* the offer is improper in two ways, first, because it does not at all explain away, but concedes that hostility exists, and, secondly, because it tends to prejudice unfairly the cause of the opponent by showing him to be an unjust man. For these reasons such evidence may be excluded: . . .''

Under all of the circumstances, we are satisfied that appellant has not received a fair and impartial trial. We cannot say that appellant would have been convicted without the

admission of the erroneous and prejudicial evidence above mentioned.

The judgment and order denying a new trial are, and each is, therefore reversed.