This cause was heard upon the record in the trial court. Each error assigned has been reviewed and the following disposition is made:
Appellant, Richard Bronner, appeals from his conviction in the Summit County Court of Common Pleas. We reverse and remand for further proceedings.
On March 16, 2001, the Summit County Grand Jury indicted Bronner for the rape of a child under the age of thirteen, in violation of R.C.2907.02(A)(1)(b), and sexual battery, in violation of R.C. 2907.03(A)(5).
The subject of the charges, "N.B.," is the four-year-old child of Angel Taylor and a man who was incarcerated in a Florida prison. N.B. and Angel lived together in Florida until Angel and N.B. came back to Akron, to live with Angel's father, William Taylor. Eventually, Angel obtained her own apartment. When Angel lost her job and her apartment, Angel and N.B. moved back with Taylor. When Angel obtained another job, she and N.B. were able to get another apartment. A month later, Bronner moved in with them. Some time thereafter, Angel was convicted of a drug offense and sentenced to six months in Oriana House. During that time, N.B. came to live with Taylor. Upon Angel's release, Bronner re-joined her in her apartment. By that time, Taylor had been awarded legal custody of N.B., but he permitted the child to spend weekends with his mother in order to maintain that relationship. While Angel worked, Bronner would baby-sit the child.
Taylor testified that in January or February of 2001, N.B. and Taylor returned home after Taylor picked N.B. up from his Head Start pre-school. Both needed to use the bathroom and went in together. According to Taylor, while they were in the bathroom, N.B. reached over and touched his grandfather's penis. Based upon that occurrence, Taylor had a discussion with the child and, as a result, called Bronner. According to Taylor, Bronner got "very excited and mad" and wanted to know if Taylor was accusing him of anything. Taylor stated that Bronner explained to him that, on one occasion, while he had been in the shower, he found that N.B. put a videotape of a pornographic movie in a videotape player. Bronner took it away and "that was the end of it[.]"
Still concerned, Taylor decided to take N.B. to a pediatrician, Dr. Zoorob, the next day. Dr. Zoorob, in turn, called Children's Services, and told Taylor that the agency would contact him. While waiting to hear from Children's Services, Taylor became anxious and called the police. He filed an initial police report and later met with Detective Mychal Brown. Detective Brown advised him to go to the CARE Center of Children's Hospital. Following that investigation, the CARE Center recommended that N.B. see a counselor through the Child Guidance Center. Taylor complied with that recommendation as well. In addition to Taylor, the jury heard testimony from N.B., Dr. Zoorob, Detective Brown, two representatives from the CARE Center, and a counselor from the Child Guidance Center.
As to N.B.'s general behavior, Taylor observed that while N.B. had been potty trained before this incident, afterwards he began having "accidents" and was wetting the bed every night. N.B.'s demeanor also changed in that he became more aggressive and hyper.
Four-year-old N.B. testified, following a determination that he was competent to testify. N.B. stated that he lived with his "papa," but would stay at his mother's apartment sometimes. He stated that he told his grandfather that Richie, as he called the appellant, pulled his (N.B.'s) pants down and "sucked my pee pee." N.B. said, "For real he did." N.B. denied watching any videos with Richie except Batman and Superman. He specifically denied watching any videos on the day "Richie sucked [his] pee-pee." On cross-examination, he stated that he knew how to put a videotape on: "I hold it, put it in and turn it on."
Dr. Ghada Zoorob, a pediatrician, testified regarding her examination of N.B., which was the first interview of N.B. by a non-family member. Dr. Zoorob was a third year resident and had not seen N.B. before this visit. She took a history from the grandfather while N.B. was in the room, and the grandfather remained in the room while she questioned N.B. Dr. Zoorob stated that she asked open-ended questions at first, but got "practically * * * no answers." Therefore, she asked more specifically, "if anybody touched his pee pee." N.B. answered that he was not supposed to tell. According to Dr. Zoorob, the grandfather intervened to help N.B. remember, but "pretty much relayed the whole story [to him] again." The doctor then asked N.B. again if "he [touched] your pee pee." The child's response was, "He just sucked it[.]" Dr. Zoorob stated that she was uncertain whether N.B.'s response was independent or based on what the grandfather said.
Dr. Zoorob continued by asking N.B. what else Bronner did, and N.B. answered, "He also bit it." During her physical examination of the child, she found no evidence of physical abuse. She examined the child's buttocks and asked if Richie touched him there. N.B. said that he sucked it. She asked if Richie put his "pee pee" in it and N.B. answered: "He put toys in it." She asked if Richie put his "pee pee" in his mouth and N.B. answered: "He puts toy [sic] in my mouth almost choking me."
Dr. Zoorob indicated that the grandfather told her N.B. had been sexually acting out. The examples she conveyed to the court were that N.B. was said to have lifted the skirt of his grandmother, and the bathroom incident.
Angela Glover, a teaching assistant in N.B.'s Head Start class, testified. She stated that in the spring of 2001, N.B. exhibited some changing behaviors. On one occasion, while the children were reading library books on the carpet and waiting to be picked up by caretakers at the end of the day, N.B. pulled his pants and underpants down. The teacher said that he had never acted out in such a way before. In addition, the teacher observed that N.B. had become very aggressive, started to hit faster, and cry more, rather than defend himself when appropriate, as he did before.
Marsha Ann Yarger, the former wife of Taylor and mother of Angel, also testified to the changed behavior of N.B. as of the spring of 2001. She testified that N.B. had visited her at her home in Florida for a week. On Easter morning, she leaned over to apply lipstick and N.B. lifted up her skirt, something he had never done before. She also said that his demeanor was unusual in that he seemed to be frightened and would not let her out of his sight.
Dr. Richard Daryl Steiner is the director of the CARE Center at Children's Hospital. The Center conducts evaluations of children alleged to be abused or neglected. He testified that N.B. was seen in the CARE Center on March 2, 2001 by a nurse practitioner, Donna Abbott. He stated that he would not expect to find physical signs of abuse from the type of sexual contact alleged in this case. On cross-examination, Dr. Steiner stated that the protocol indicates a preference that the child care provider should be interviewed alone first and the child should then be interviewed without his or her provider being present. He indicated that "[t]he only exception would be with a young child, four or five, that may not separate, may have some anxiety[.]" He also indicated that, while leading questions are generally not appropriate for a teenager, it might be necessary with a smaller child because such child's language development is less pronounced.
Eric W. Middendorf, admission coordinator and professional counselor with the Child Guidance Center, performed N.B.'s intake interview and was N.B.'s counselor at the Center. By training, Middendorf is qualified to make diagnoses and treat mental illness. His first contact with this matter was a telephone call from the grandfather who said that N.B. was clingy and anxious, had reported sexual contact, and was having difficulty sleeping. N.B. also reportedly did not understand why he was not in jail when he did the same thing Richie had done. At the intake interview, Middendorf also learned that N.B. was being aggressive with his peers, and that this reflected a change in his behavior. Middendorf identified several "indicators" and diagnosed N.B. with "sexual abuse of [a] child." The diagnosis was based on the history given by the grandfather and the presence of behavioral indicators. Those indicators include bed-wetting, difficulty sleeping, being clingy with his grandfather, demonstrating aggressiveness with peers and a report from Head Start about inappropriate touching with a female peer.
Middendorf recommended weekly counseling sessions and continued to see N.B. through the time of the trial on this matter. He met with N.B. alone only once. Otherwise, the grandfather was also present because N.B. was hesitant to meet with Middendorf alone. However, the grandfather sat off to the side, Middendorf stated, and the child did not look to him for cues. Middendorf was alerted by the grandfather to the fact that N.B. had an active imagination and would occasionally make statements that were make-believe. Therefore, the counselor inquired of the child to ascertain his ability to distinguish between real and make-believe. The counselor was apparently satisfied that the child could make those distinctions. The counselor also testified that N.B. told him: "Richard sucked my pee pee and made me suck his pee pee." Middendorf said that the child remained consistent on this and also indicated that this statement was real, as opposed to make-believe.
On cross-examination, Middendorf stated that N.B. was in the same room when his grandfather provided a history of information for the initial assessment. He also explained that the presence of some behavioral indicators does not necessarily mean that the child had been sexually abused and that these behaviors could, in fact, be caused by other stresses in the child's life.
Middendorf was asked to consider the guidelines of the American Professional Society on the Abuse of Children and the American Academy of Child and Adolescent Psychiatry. The witness confirmed that the guidelines indicate a preference for interviewing the child alone, avoiding leading questions and repeated questions, and minimizing the number of evaluations a child goes through. Middendorf took great pains to avoid leading questions and tried to interview the child alone, but N.B. experienced separation problems. Middendorf never saw the grandfather signal to N.B. The grandfather's role was usually to cue N.B. to sit down if he was overactive. Middendorf said the grandfather did nothing to suggest that he was telling N.B. what to say. N.B. had been interviewed by five people before talking to Middendorf: his grandfather, Dr. Zoorob, Detective Mychal Brown, a nurse practitioner at CARE and a social worker at CARE. Middendorf agreed that utilizing improper techniques can lead to contamination of the child's testimony, i.e. causing undue influence on the child to make statements or act in certain ways.
During his cross-examination, Middendorf indicated several things that caused him concern. First, he said that he had not received a copy of Dr. Zoorob's records. He stated that if he had known that the interview was conducted while the grandfather was present, that it was conducted with "leading questions," and that the grandfather reminded N.B. of some allegations, it would be a concern because it could cause contamination of the witness' ability to testify. Second, the fact that N.B. was said to have alleged additional details in other interviews, but that those same details were not reported to him, causes him concern.
On re-direct and in sum, Middendorf stated that, notwithstanding the potential concerns raised on cross-examination, he would not change his diagnosis of N.B. He would, however, like to go back and read the reports that he had not had an opportunity to see.
Detective Mychal Brown was the last witness for the State. He has been a police officer since 1984, served in the juvenile bureau for four years, and his training included several schools, including one sponsored by the Department of Justice and specializing in the investigation of abused children. His training is updated annually. He has investigated a total of 400-500 cases involving either sexual or physical abuse and approximately 200 sexual abuse cases. Following the initial police report on February 8, 2001, Detective Brown interviewed Taylor and then N.B. Based upon those interviews, he referred N.B. to the CARE Center at Children's Hospital and also spoke with Dr. Zoorob, N.B.'s mother, and Bronner.
While Bronner did not testify at the trial, Detective Brown testified regarding his interviews of Bronner. Bronner came for his first interview on February 23, 2001. At that time, Bronner was said to have reported that N.B. visited on weekends and Bronner would baby-sit while N.B.'s mother worked. Bronner reportedly denied all allegations as to improper touching or watching pornographic movies with N.B.
Bronner agreed to meet with Detective Brown again on March 7, 2001 and was arrested at that time. According to the detective, Bronner said that some portion of a pornographic movie had been playing, and later Bronner fell asleep on the couch. Brown reported that Bronner stated: "[H]e was awakened when he felt someone kissing on his penis. He woke up, realized it was [N.B.], and pushed him away. He explained to him that that was wrong." According to Brown, Bronner stated that "[h]e was awakened a second time when he felt something on his head. He woke up and [N.B.] was trying to put his penis in his mouth."
Brown testified that he attempted to tape record this statement, but because of the acoustics in the room, the conversation was too difficult to understand. Therefore, Brown brought Bronner back the next day, March 8, 2001, for another interview. Brown used the same tape, taping over the March 7, 2001 interview. Brown testified that in this interview Bronner said N.B. "woke him up and told him he kissed his penis." Then he awoke a second time, according to Brown, to find N.B. kissing his penis.
The taped statement itself, was also admitted into evidence. On the tape, Bronner denied the allegation that he was "molesting" N.B. Bronner explained that he found N.B. watching an explicit videotape. N.B. asked a few questions, and Bronner explained that the videotape depicted adult behavior. Bronner then put a children's videotape on for N.B. and dozed off on the couch. He stated that he was later awakened by N.B., saying "I kissed your pee-pee." Bronner said he admonished N.B. and told him "Boys don't kiss boys' pee-pees." N.B. said, "I want you to kiss my pee-pee." Bronner told him "No. That was wrong." Still later, he was again awakened by N.B., jumping on his face and saying, "I made you kiss my pee pee. You kissed my pee pee." Bronner claimed that N.B. started calling him "Daddy" about a month later, that Taylor did not like that and threatened to send N.B. to Florida, away from Angel and Bronner. According to Bronner's statement, Taylor's charges against him came about three days later.
At trial, the defense presented one witness, Kerri Ann Marshall, a social worker in the CARE Center at Children's Hospital. She became involved with the present matter on March 2, 2001, when Taylor brought N.B. in with allegations of sexual abuse. She first spoke to the grandfather alone and took a history. Next, she interviewed N.B. and, finally, performed a physical exam on the child.
During the interview of N.B., she asked questions to establish a rapport, determine his developmental level, and whether he knew the difference between the truth and a lie. According to the witness, N.B. said, "A truth is you don't lie, and a lie is a lie." She indicated that N.B. reported he lived with "[n]obody," that his favorite food is "bugs," and he "eats monsters up." She asked him to identify the private parts on his body that he did not want anyone to touch. He either would not or could not do so. Then she asked him if anyone "had ever touched him." He answered, "no," so she did not question further. She did not ask more specific questions, she explained, because her investigative goal is not to ask leading questions. The witness stated that if Taylor provided a history to Dr. Zoorob in the presence of N.B. or if Dr. Zoorob did ask leading questions during her interview of the child, those would be matters of concern to her.
In conclusion, the witness read from her report: "[N.B.] has not given a history of sexual abuse during this evaluation. The history the grandfather has provided certainly raises a suspicion of sexual abuse."
At the conclusion of all the evidence, a jury found Bronner guilty of both rape and sexual battery. The court sentenced him to a term of imprisonment for ten years for rape and to a term of five years for sexual battery. The court further ordered that the sentences were to be served concurrently and were to be merged because the offenses are of similar import. In addition, the trial court determined and adjudicated that Bronner was a sexual predator. This appeal followed.
 First Assignment of Error "THE TRIAL COURT COMMITTED REVERSIBLE ERROR WHEN IT PERMITTED THE STATE TO REPEATEDLY INTRODUCE PREJUDICIAL TESTIMONY REGARDING THE CHARACTER OF THE ACCUSED."
Through this assignment of error Bronner contends that impermissible evidence of a prior arrest, a conviction, illegal activity, and other acts was improperly admitted into evidence at his trial. We agree.
Evid.R. 404(B) provides: "Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith." Such evidence may, however, be admissible for other purposes such as proof of "motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." Id.
The State has not argued at trial or on appeal that the disputed evidence was admissible for any purpose under Evid.R. 404(B). Instead, the State has argued that the evidence should come in because Bronner "opened the door" to this evidence by suggesting Taylor disliked Bronner for racial reasons. On appeal, the State has also argued that the evidence is admissible to rebut arguments made by the defense.
 I. The Factual Record
The record discloses that during opening argument defense counsel stated the following:
 "Folks, you are also going to hear evidence that Bill Taylor was not fond of Mr. Bronner, they did not have a good relationship. Obviously, Mr. Bronner is African-American, as was [N.B.'s] natural father [also] African-American.
 "I believe the evidence will show, ladies and gentlemen, that Mr. Taylor didn't like that, he didn't like the fact that his daughter was dating an African-American and was unhappy about the fact that he had a biracial grandchild.
 "Folks, the evidence will also show that in January of 2001, just two or three weeks before these allegations were made, Mr. Taylor, who had custody of [N.B.] at the time, learned that his daughter, Angel, was pregnant with Richard Bronner's child. I don't believe he was very happy about that and I think the evidence will demonstrate that."
 The State called Taylor as its first witness and inquired, in part, as follows:
 "Q. Now, [N.B.], how does he refer to Richard Bronner? What does he call him?
"A. He was calling him `Daddy.'
"* * *
 "Q. * * * first of all, the fact he was calling Richard Bronner `Daddy,' what did you think about that?
"A. I didn't like that.
"Q. Why not?
 "A. Well, because he's not his daddy and the fact he's shacking up with my daughter, it's not appropriate for my grandson to be calling him Daddy."
On cross-examination, defense counsel inquired along these same lines, reiterating that Taylor was unhappy that Angel had a child with a man she was not married to and that she lived with Bronner while not married to him. The defense also established when Taylor learned that his daughter was pregnant with Bronner's child and when he made his charges against Bronner. Taylor stated that he learned of his daughter's pregnancy at the end of February or the beginning of March, although she may have known of the pregnancy as early as January. Taylor reported his charges against Bronner at the beginning of February.
The only reference to race by defense counsel during the cross-examination of Taylor was as follows:
"Q. Your grandson, [N.B.], is a biracial child?
"A. Yes, he is.
"Q. Did that concern you at all?
"A. No."
There were no further questions along this line.
At the conclusion of the cross-examination of Taylor, the prosecutor requested a sidebar conference at which he argued that defense counsel inaccurately left the impression that Taylor did not like Bronner for a racial reason and the prosecutor wanted to rebut that impression by presenting other reasons why Taylor may not like Bronner, reasons which included a prior arrest, a conviction, alleged illegalities and other acts. Defense counsel contended that his questions of Taylor on cross-examination did not "open the door" to testimony of prior criminal convictions. The trial court ruled that the State was permitted to introduce these reasons for Taylor's dislike of Bronner in order to rebut the impression that Taylor was racially biased against Bronner and to explain in full why he may not like Bronner.
Over defense objection, the prosecutor was permitted to elicit testimony regarding an incident involving an "altercation" between Bronner and the police, prior drug use, an arrest for cocaine use, a six-month sentence to Oriana House, and exposing N.B. to marijuana smoke. The prosecutor was also permitted to elicit testimony that Taylor did not like Bronner because the apartment was so filthy that it had maggots in it and because Bronner never worked, would not participate or "do anything." The prosecutor was permitted to argue these facts during his closing argument as well.
 II. Analysis A. Opening Statement
We first consider whether the comments of defense counsel in opening statement may be relied upon by the State for purposes of its argument. Initially, we observe that the State did not object to the above-quoted comments in the opening statement of defense counsel. In addition, this court has indicated that error will not result from comments on evidence made during opening statements unless such evidence is subsequently determined to be inadmissible. State v. Overholt (Aug. 18, 1999), 9th Dist. No. 2905-M, at 12, appeal not allowed (1999), 87 Ohio St.3d 1459. There was no suggestion or argument at trial or on appeal that the substance of defense counsel's opening statement was inadmissible, only that the State disagreed with the idea that its witness was biased or motivated by race.[1]
Next, we note that the State has not presented any authority in support of its position that defense counsel's opening statement "opened the door" to rebuttal evidence of the kind introduced in this case, and we do not adopt that position now. It is well settled that opening statement is not evidence. See, e.g., State v. Frazier (1995), 73 Ohio St.3d 323,338. The jury in this case was so instructed, and the jury is presumed to follow the instructions of the court. See State v. Raglin (1998),83 Ohio St.3d 253, 264.
In West Virginia v. Richards (1993), 190 W. Va. 299, 438 S.E.2d 331, the court considered the question of whether a remark made during opening argument can provide the foundation for the admission of collateral crimes on rebuttal. Id. at 303. After surveying relevant state and federal law, the West Virginia court concluded that a remark made during opening statement has no evidentiary value and does not lay a foundation or "open the door" for the introduction of otherwise inadmissible character evidence by the opposing party. Id. Similarly, the Second Circuit Court of Appeals has indicated that in such a situation, the argument could effectively be explained or neutralized by counter-argument or by instruction of the trial court; the introduction of otherwise inadmissible evidence is not justified. United States v.Tomaiolo (C.A.2, 1957), 249 F.2d 683, 689.
We agree with this reasoning and conclude that, because statements regarding the potential bias of a prosecution witness made in opening argument are not evidence, such statements may not lay a foundation for or "open the door" to rebuttal with otherwise inadmissible character evidence as to the defendant.
Furthermore, as set forth more fully below, even if opening statements were permitted to "open the door" to some type of rebuttal evidence, a party may not rebut bias with more evidence of bias, and may not properly introduce evidence when the prejudicial effect significantly outweighs the probative value.
 Evidence at Trial
We next consider the evidence presented at the trial itself. In reviewing the record of this case, we observe that the State was the first party to introduce facts into evidence establishing that Taylor disliked Bronner. In his direct examination, as set forth above, Taylor admitted that he did not like the fact that his daughter was living with Bronner when they were not married, and he did not like the fact that N.B. called Bronner "Daddy." Thus, the fact that Taylor may have been biased against Bronner was first established by the State.
As a result, on cross-examination, defense counsel mainly revisited these same points already established by the prosecutor.[2] Except for the brief exchange in which Taylor denied any concern that his grandson was biracial, there was no mention of race by defense counsel.[3] Upon this record, the trial court permitted the State to introduce prejudicial character evidence to explain other reasons why Taylor did not like Bronner and to rebut the alleged impression that Taylor was racially biased against Bronner.
In considering Bronner's assignment of error, we must determine if it was error to allow the jury to hear the disputed testimony, and if so, whether such error was prejudicial or harmless. In the present case, we conclude that it was error to allow the jury to hear prejudicial character evidence, over defense objection, on matters unrelated to the present charges against him. We find that allowing this testimony was error for three separate reasons.
 No Open Door
At the outset, we recognize that it is fundamental that an accused has a right to explore the bias of a witness against him in order to test credibility. State v. Gavin (1977), 51 Ohio App.2d 49, 53. Evidence of a witness' potential bias is intended "to cause a jury to think critically about the testimony being offered." Oberlin v. Akron Gen. Med. Ctr. (2001), 91 Ohio St.3d 169, 173. Taylor was, essentially, the prosecuting witness in this case, and Bronner was entitled to explore whether Taylor had any reason to "slant, unconsciously or otherwise, his testimony[.]" See United States. v. Abel (1984), 469 U.S. 45, 52, 83 L.Ed.2d 450. Bronner was entitled to inquire regarding potential "[b]ias, prejudice, interest, or any motive to misrepresent" that may have existed in witness Taylor. See Evid.R. 616(A). While Taylor deserves credit for his apparent devotion to his grandson, the question of whether Taylor had an ulterior motive in bringing these charges must be "fair game" in a trial of this sort.
The State claims that a "door was open" to the presentation of the otherwise inadmissible evidence by the cross-examination of defense counsel. As stated above, the State was the first party to present evidence establishing that Taylor disliked Bronner. On cross-examination, since bias was already raised and admitted, defense counsel basically tracked the same line of questioning. Defense counsel referred to race on only one occasion: asking whether Taylor was concerned that his grandson was biracial. We have serious doubt that this single inquiry "opened any doors." The inquiry, as it appears in the record, seems nothing more than a temperate question relating to the child's well-being. Moreover, the negative answer by Taylor ended the inquiry for the defense. Such a statement may simply stand on its own for the consideration of the trier of fact or permit related argument by counsel in closing.[4]
If, however, the question can be construed as "opening a door" to the question of racial bias, then it did so in a very limited manner — regarding the witness' concern for the well-being of his grandson in that he is biracial. The State would then be entitled to respond to that single concept alone. In this case, the State could point to the grandfather's love and affection for his biracial grandson, including the fact that he has legal custody of the child. The disputed character evidence regarding Bronner would not only be irrelevant, but unnecessarily prejudicial.
The State has cited to State v. Patton (May 27, 1993), 8th Dist. No. 62020, in support of its position. The dissent also relies upon this case. Patton appears to consider the question of whether a defense inquiry may "open a door" to the introduction of evidence of prior crimes by the defendant. However, it reaches a very conclusory result. The portion of the opinion that considers this question is very brief, and the conclusion is reached without any analysis or factual context. See id. Further, the court only concluded that the matter was not reversible error, and did not indicate whether the matter was not error at all or harmless error. See id. We find Patton to be unpersuasive on the question before us.
The dissent has taken the position that the State should be entitled to "explain" bias by introducing another reason for the bias of the prosecuting witness. We find the argument to be inapplicable to the case at bar since it was the State that first introduced evidence establishing that Taylor was biased against Bronner. Furthermore, the additional step taken by the defense was a minor one which does not merit the disproportionate response and invocation of prejudice which occurred in the case at bar.
The dissent has cited to three cases in support of its position. First, in Vermont v. Recor (1988), 150 Vt. 40, 549 A.2d 1382, the parties agreed before trial that no reference would be made to an alleged prior assault by the same defendant against the same complaining witness. Defense counsel breached the spirit of that agreement when, after attempting to demonstrate dislike and, then, hatred for the defendant, he "pressed for reasons for this hatred." Id. at 43. Under these circumstances, the court permitted the prosecutor to allow the complaining witness to testify that one reason for her hatred was that the defendant previously assaulted her.
While the reviewing court reasonably permitted the testimony of a prior criminal act in that case, the court cautioned against "[creating] a license for the prosecutor to engage in `overkill' nominally justified by the defendant's actions in raising a line of questions." Id. at 44. The court warned against a prosecutorial response that goes far beyond the inquiry opened by the defendant. Id., citing State v. Batchelor (1977),135 Vt. 366, 376 A.2d 737.
Second, in North Carolina v. Patterson (1973), 284 N.C. 190,200 S.E.2d 16, the court permitted evidence of a prior crime by the defendant in "explanation" of bias. However, the cited authority explains that the stated goal is not to provide additional grounds for bias, but to "explain [the circumstances evidencing bias] away[.]" (Emphasis added.) Id. at 196, quoting 1 Stansbury's North Carolina Evidence Section 45 (Brandis Rev. 1973). This is quite different and is consistent with our approach to this question, i.e. demonstrating the non-existence of the given grounds, not suggesting additional grounds. In addition, in denying the defendant's assignment of error, the Patterson court also found the defendant failed to properly preserve the error under North Carolina law, an omission which does not exist in the case at bar. See id.
Third, Lloyd v. Delaware (Del. 1991), 604 A.2d 418, is a case with which we simply disagree. It is an anomalous case, which has not even been cited in its own state or any other state for the proposition on which the dissent relies. In Lloyd, the complaining witness testified to prior misconduct of the same sort as the underlying charge and involving the same defendant. The court used unusual reasoning to conclude that this evidence was not prejudicial. While few procedural facts are provided, we do not believe this case reflects the status of Ohio law.
Other courts have approached the question of whether and when the defense "opens the door" to prejudicial character evidence in rebuttal in a more even-handed manner and with concern for the potential prejudice to the accused. The federal court of appeals for the D.C. Circuit warned that the doctrine is "dangerously prone to overuse." United States v.Winston (C.A.D.C. 1971), 447 F.2d 1236, 1240, quoting United States v.McClain (C.A.D.C. 1971), 440 F.2d 241, 244. It has been observed that "[o]pening the door is one thing. But what comes through the door is another. Everything cannot come through the door." Winston,447 F.2d at 1240.
Therefore, the Winston court noted that "[t]he doctrine is to prevent
prejudice and is not to be subverted into a rule for injection of prejudice." (Emphasis added.) Id. The introduction of otherwise inadmissible evidence under the "shield of this doctrine is permitted `only to the extent necessary to remove any unfair prejudice which might otherwise have ensued from the original evidence.'" Id., quotingCalifornia Ins. Co. v. Allen (C.A.5, 1956), 235 F.2d 178, 180.
In the present matter, defense counsel's single question regarding whether Taylor was concerned because his grandson was biracial, is, at most, minimally detrimental to the State's case. Any concern could have readily been addressed by establishing that Taylor loves and cares for the child. It was not necessary to go beyond and instill unfair prejudice to the defendant.
Similarly, in Harrison v. Kentucky (Ky.App., Sept. 19, 1986), No. 85-CA-2612-MR, 1986 Ky. App. Lexis 1232, a Kentucky appellate court held that where bias was evidenced by the fact that a crime victim had previously sworn out warrants against the defendant, the State was not entitled to go into the details of the underlying crime in rebuttal. The reviewing court held that the evidence was not admissible as an "explanation of bias" and must be excluded because it was irrelevant to the issue of bias or the facts of the case; the evidence only served to create prejudice to the defendant. Id.
In another example of a case where the State wished to go beyond thefact of bias or hostility and introduce evidence of prior criminal acts by the defendant as a cause of such hostility, the reviewing court focused on the inequity that may arise from such a practice:
 "The reason why the witness was hostile towards appellant was not a proper subject for either direct or redirect examination by the prosecution. The elicitation by the appellant of the witness' ill-feeling towards him did not open the door to proof by the prosecution that such ill-feeling was the result of criminal acts of appellant against the witness. Otherwise it would be most dangerous to cross-examine a witness as to his bias and prejudice towards the accused, for, if such reason may be given, all kinds of extraneous and unrelated offenses might be detailed to the jury, so that the trial would be not of the particular offense charged but of many offenses not charged." Sneed v. Arizona (1932), 40 Ariz. 441, 444, 14 P.2d 248.
 Another court, reaching a similar result, has reasoned as follows:
 "The reason for the rule is obvious. When the defendant is able to prove that a prosecution witness is prejudiced[,] if that witness could then explain the reason for the prejudice by stating what he knows about other wrongful acts, it would bring into the case all kinds of extraneous and unrelated offenses not relevant to the issue, and would permit the prosecuting attorney to do indirectly what he cannot do directly." (Emphasis added.) California v. Zemavasky (1942), 20 Cal.2d 56, 63, 123 P.2d 478.
The legal principle of these cases is well stated by the author of the treatise on evidence, John Wigmore. On this point, Wigmore wrote:
 "When [hostility is imputed] to the opponent, the true process of explanation consists in showing that the facts offered do not really indicate the conclusion suggested, i.e., the hostility. Thus, when the counter-evidence does not attempt to do this, but admits the hostility and desires to show that it was justifiable by the opponent's conduct, the offer is improper in two ways, first, because it does not at all explain away, but concedes that hostility exists, and secondly, because it tends to prejudice unfairly the cause of the opponent by showing him to be an unjust man." (Emphasis sic.) 3A Wigmore, Evidence (Chadbourne Rev. 1970) Section 952.
Thus, to the extent the State argues the need to "explain the bias" of witness Taylor, it ought to show that the facts offered do not really indicate the conclusion suggested, i.e., Taylor is not racially biased. But by instead admitting bias, and attempting to show that it was justifiable by the opponent's conduct, the prejudicial character evidence is improperly admitted because it does not defeat the claim of bias and also unfairly prejudices the defendant.
In sum, we believe the view set forth above through citation to Wigmore and the cases consistent with that position, present the more reasonable approach. Consequently, we conclude that the defense did not "open a door" to the prejudicial character testimony admitted in the case at bar.
 Not Proper Rebuttal
Next, we find that the evidence introduced by the State was not proper rebuttal under the circumstances. If the State wished to rebut an implication of racial bias on the part of witness Taylor, as they claimed, they would be obligated to present evidence that tended to disprove racial bias, not evidence that demonstrated additional reasons for bias on the part of Taylor. In other words, the State should have countered the alleged claim of racial bias, i.e., established that the witness is not racially biased. The essential point is simple: Bias may not be rebutted with more bias.
In the present case, the allegedly curative testimony did nothing to suggest Taylor was not in fact biased against Bronner because of race. That thought, if it ever did exist, is still present. But what has also been done, as a result of allowing this testimony, is to improperly discredit Bronner's character in front of the jury. Another court has reasoned similarly:
 "Such evidence in no way `cured' the shadow of bias cast upon [the witness]. The effect of the evidence was only to show what good reasons [the witness] had to be biased and to discredit [the defendant's] character in front of the jury." Bentley v. Alaska
(Alaska App. 1985), 711 P.2d 544, 547.
The position taken by the State,[5] that an inquiry into potential bias of a prosecuting witness entitles the State to disclose prejudicial character evidence, makes Evid.R. 404 illusory. If the accused fails to inquire, he gives up the opportunity to reveal potential bias in the central witness against him. On the other hand, if the accused does inquire as to bias, — no matter the answer — under the State's theory, he is bound to suffer the disclosure of otherwise prohibited evidence. We find this result to be inherently unfair.
In this case, the State has injected evidence that does nothing to rebut the claimed insinuation of racial bias on the part of witness Taylor, provides no evidence of any probative value in regard to the charges before the court, and causes unfair prejudice to the accused. Therefore, because the probative value of this evidence is substantially outweighed by the risk of unfair prejudice, it was error to allow it to come into evidence. See Evid.R. 402 and Evid.R. 403(A).
 Inadmissible Character Evidence
Finally, we also conclude that this line of questioning constituted, in effect, an impermissible attack on Bronner's character. Such an attack was impermissible because Bronner had not placed his character in issue.State v. Lytle (1976), 48 Ohio St.2d 391, 401-402, vacated in part on other grounds (1978), 438 U.S. 910, 57 L.Ed.2d 1154; State v. Davis
(1975), 44 Ohio App.2d 335, 344. Moreover, this evidence of other acts was not relevant to proof of guilt of the defendant of the offense in question. Nor did it tend to establish "motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." Evid.R. 404(B). See, also, R.C. 2945.59.
Such evidence is inadmissible for the reason that it is both legally irrelevant and highly prejudicial. It poses a
 "temptation * * * for the jury to try the case on evidence of character rather than on evidence of guilt. When such character evidence is allowed, it becomes difficult for the jury not to speculate that since the defendant has shown a propensity for committing criminal or bad acts in the past, i.e., is a bad person, he probably committed the present crime. The result is a potential for prejudice with respect to not only the weighing of the evidence but also the creation in the jury's mind of an urge to punish for past acts." State v. Griffin (2001), 142 Ohio App.3d 65, 71, citing Lily, the Law of Evidence (1978) 124, Section 43. See, also, State v. Wilkinson (1980), 64 Ohio St.2d 308, 314.
Thus, the very real concern is that a jury will convict the accused for his past actions, as opposed to considering only evidence relevant to the crime for which he is on trial. The Ohio Supreme Court has stated that "[a]lthough character is not irrelevant, the danger of prejudice outweighs the probative value of such evidence. The danger of prejudice is at its highest when character is shown by other criminal acts[.]"Lytle, 48 Ohio St.2d at 402. The improperly admitted evidence in the case at bar did, of course, include criminal acts.
As a result of the prejudice that might result from the admission of such evidence, the Ohio Supreme Court has indicated that both Evid.R. 404(B) and R.C. 2945.59 are to be strictly construed against the state and conservatively applied by the trial courts. State v. DeMarco (1987),31 Ohio St.3d 191, 194. Doubts should be resolved against admissibility.State v. Broom (1988), 40 Ohio St.3d 277, 282. This principle is a "fundamental part of our Anglo-American criminal jurisprudence." Statev. Hector (1969), 19 Ohio St.2d 167, 175.
In the present case, evidence of an arrest, conviction, lazy habits, or slovenly housekeeping are not relevant in any way to the charges against Bronner. The evidence does not come within any of the exceptions set forth in Evid.R. 404(B) or R.C. 2945.59. By the State's argument, the evidence was admitted to explain the possible bias of Taylor, theprosecuting witness. However, this type of evidence is prohibited unless it tends to show one of the enumerated matters and is relevant to proof of guilt of the defendant. We find that the evidence does not come within any of the enumerated matters and is not relevant to proof of guilt of the defendant on the charged offenses. Therefore, the evidence may not properly be admitted.
Accordingly, for all of the above stated reasons, we find that the admission of the testimony regarding other acts was error.
 C. Harmless Error or Prejudicial Error
Having determined that the testimony in question was error, we next determine whether the error was harmless or prejudicial.[6] In order to declare this error harmless, this court must be able to declare a belief that the error was harmless beyond a reasonable doubt. Lytle,48 Ohio St.2d at 403; State v. Bayless (1976), 48 Ohio St.2d 73, 106, vacated in part on other grounds (1978), 438 U.S. 911, 57 L.Ed.2d 1154; Chapman v.California (1967), 386 U.S. 18, 24, 17 L.Ed.2d 705. This means that the court must be satisfied beyond a reasonable doubt that the error did not contribute to the defendant's conviction. State v. Johnson (1994),71 Ohio St.3d 332, 339; Chapman, 386 U.S. at 24. Stated otherwise, the court must be able to conclude that there is no reasonable possibility that the improperly admitted testimony contributed to defendant's conviction. Lytle, 48 Ohio St.2d at 404. Further, just as a party must object to preserve a claim of error, the converse of this rule is that where a party insists on the introduction of certain evidence at trial, he has the burden to show its harmlessness on appeal. Chapman,386 U.S. at 24.
The Ohio Supreme Court has indicated that a reviewing court must assess the probable impact of prejudicial testimony on the average juror and must consider the trial tactics of the prosecution. See State v. Young
(1983), 5 Ohio St.3d 221, paragraph two of the syllabus. We have already explained that this type of evidence is generally excluded because of its disproportionately prejudicial impact on jurors. In this case, the insistence on getting this evidence before the jury appears all the more intentional and tactical on the part of the prosecution in light of the fact that defense counsel filed a pretrial motion in limine to prohibit reference to Bronner's prior criminal record and that the state first inquired as to Taylor's dislike of Bronner.
In reviewing the record in this case, we initially consider that, except for the testimony of the four-year-old child and inconclusive behavioral indicators, there is no direct evidence that the alleged acts took place. Second, we take note of the young age and active imagination of the child, the questionable nature of the interrogation of the child as pointed out by the State's own witnesses, and the great potential that the child's testimony was contaminated by the process. Third, we note that one of the State's expert witnesses was forced to compromise his conclusion based upon the faulty methodology used in questioning the child, a second was uncertain if the child was expressing his own independent views or those of the grandfather, and the testimony of a third established that the prescribed protocol was not followed in the examination of this child. Another expert witness from the CARE Center testified for the defense and could not conclude, based on her interview of N.B., that the child had been sexually abused.
Furthermore, we do not find Bronner's own statement to be compelling in favor of the State's case. According to Detective Brown, apparently Bronner stated that he fell asleep one night, perhaps while watching an explicit videotape, and was awakened by N.B. attempting to kiss his penis and possibly put his penis near Bronner's face. Bronner stated that he stopped the child and admonished him. Bronner's taped statement puts these actions in a slightly different context and is consistent with the active, mischievous child described by witness Middendorf. While reflecting far from commendable behavior, it is also not incredible that the child mimicked something he saw on a videotape. Such an event does not constitute criminal sexual conduct.
Therefore, in considering the remaining evidence, the jury's perception of Taylor and Bronner was of critical importance to this trial. For the prosecution to use the ploy of purportedly denying racial bias in Taylor by introducing improper and unfairly prejudicial testimony against the defendant strikes at the heart of that perception. It discredits the defendant in the eyes of the jury by covering him with an arrest, conviction and other acts which have no possible relevance to the matter at issue.
It is also significant that the prosecution, apparently believing that the evidence would be useful to its cause, placed great emphasis upon the "attack" on Taylor's credibility and on Bronner's arrest during its closing argument, thus emphasizing the erroneous evidence and contributing to the conclusion that this error cannot be considered harmless. The prosecutor stated in closing argument: "I am so concerned that somehow this attack on [Taylor] is going to sway your decision on something that it is completely irrelevant, so I am going to spend my entire closing statement, almost all of it, to address that fact[.]" The prosecutor continued:
 "[PROSECUTOR]: [Bronner and Angel] together somehow ended up getting arrested with drugs in the apartment where [N.B.] was staying.
"[DEFENSE COUNSEL]: Objection.
"THE COURT: It's overruled.
 "[PROSECUTOR]: Wouldn't that be a good reason for anyone not to like the person that your daughter is seeing? * * * Would you have done anything differently? No. What did he do wrong there? Nothing."
This Court concludes that the testimony that was erroneously admitted, under the flawed theory of rebutting a charge of racial bias in a prosecution witness, resulted in a thoroughly improper attack upon the credibility of the accused. Given the young age of the child, the questionable nature of the interrogation of the child as pointed out by the State's own witnesses, and the great potential that the child's testimony was contaminated, we cannot conclude that this error was harmless beyond a reasonable doubt. We disagree with the conclusion of the dissent that the evidence of guilt is overwhelming.
Moreover, under these circumstances, we cannot say that the State has demonstrated, beyond a reasonable doubt, that the erroneously admitted testimony did not contribute to Bronner's conviction. Indeed, we think it reasonable to conclude that the average juror would have considered it and would have been affected by it. We find that the erroneous admission of this evidence affected the "substantial rights" of the accused. See Crim.R. 52(A). Bronner's first assignment of error is sustained.
Because we find merit in Bronner's first assignment of error, it is not necessary for this court to address the remaining assignments of error. See App.R. 12(A)(1)(c). The judgment of the court of common pleas is reversed, and the matter is remanded for further proceedings.
WHITMORE, J. CONCURS
[1] There was a basis for the defense argument that Taylor was racially biased against Bronner. It came through Bronner's taped statement to the police, which was placed in evidence by the State.
[2] Cross-examination by defense counsel on Taylor's attitude towards Bronner was as follows:
 "Q. How did you feel about your daughter, Angel, having a child with [N.B.'s father]?
"A. I was against that.
"Q. Why was that?
"Because she wasn't married.
"* * *
"Q. Did you have a good relationship with Mr. Bronner?
"A. Fair.
"Q. Were you happy that he was living with your daughter?
"A. No.
"Q. I believe you termed it as `shacking up[?']
"A. Yes.
 "Q. Do you say that because they weren't married when they were living together?
"A. Well, yes.
"* * *
 "Q. [Y]ou have indicated on direct examination that you are aware that your grandson, [N.B.], would refer to Mr. Bronner as `Dad.'
"A. Yes.
"Q. That didn't make you happy, did it?
"A. No.
"Q. That was because he wasn't his dad, right?
"A. That's right.
 "Q. He wasn't married to your daughter, is that fair to say?
"A. That's fair to say."
[3] Based upon this record, we, therefore, disagree with the assertion by the dissent that the cross-examination was "replete with questions implying bias against Bronner because he was black."
[4] It may be fair speculation that if Taylor had answered the question in the affirmative, or if he were asked and he indicated that he was in fact racially biased, the State would, again, argue that the door was open to the same character evidence. To include such testimony under either scenario raises a question of basic fairness.
[5] The dissent also adopts this position.
[6] The State has also argued that any error is harmless. In making this claim, the State relies on the testimony of the child and claimed admission by defendant. Since the defendant did not testify at trial, it is important to consider not just the words of the detective who reported defendant's words, but the taped statement of the defendant as well.