Filed 12/2/13  P. v. Miller CA3

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| THE PEOPLE,<br><br>        Plaintiff and Respondent,<br><br>    v.<br><br>DARRELL MILLER,<br><br>        Defendant and Appellant. | C071700<br><br>(Super. Ct. No. 11F01280) |

Accused of aiding and abetting his putative stepfather's shooting of a Crip gang member, defense counsel argued that not every criminal act by a gang member is gang related, and defendant Darrell Miller had no idea that his stepfather was going to fire at three people walking down the street.  The jury did not find him guilty of the alleged gang enhancement, although he, his stepfather, and his good friend, who was also an occupant of the car at the time of the shooting, were all validated members of Blood gangs.  On appeal, he contends there is insufficient evidence to support his conviction for second degree murder, and his booking and classification fees must be reversed.  We disagree with both contentions and affirm the judgment.

1

# I

## *Sufficiency of the Evidence*

Defendant has a heavy burden in attempting to topple a jury verdict based on insufficiency of the evidence.  Well-worn limitations on the scope of appellate review narrowly define our job and severely hamper a defendant's ability to prevail on appeal.  Although we must comb the entire record for evidence that is substantial, we must reject an insufficiency claim if a rational trier of fact could find a defendant guilty beyond a reasonable doubt.  (*People v. Johnson* (1980) 26 Cal.3d 557, 576-578.)  Moreover, we must view the evidence in the light most favorable to the prosecution and presume the existence of every fact the trier of fact could reasonably deduce from the evidence.  (*People v. Stanley* (1995) 10 Cal.4th 764, 792-793.)  Thus, we will describe the facts through this prism, attributing favorable inferences to the prosecution yet rejecting inferences based on sheer suspicion and speculation.  (*People v. Marshall* (1997) 15 Cal.4th 1, 35.)

Eighteen-year-old defendant Darrell Miller grew up with the prosecution's key witness, Tyvone Allen.  They were best friends, like brothers.  Codefendant Torrey Adams had been Miller's mother's boyfriend for many years.  Defendant thought of Adams as his stepfather, although Adams proved to be a very poor role model.  Adams sold drugs, carried weapons, committed gang-related assaults, and ultimately shot and killed the victim in this case, Antonne Nelms.  A gang expert for the prosecution testified that defendant and Allen were validated members of the Oak Park Bloods; Adams also was a Blood gang member but belonged to a different clique.

The prosecution's theory that defendant aided and abetted the shooting is based on circumstantial evidence rooted in several events preceding the shooting that involved defendant.  Indeed, the prosecutor argued that this case is all about defendant Miller.  Defendant insisted it was all about codefendant Adams.  Two separate juries were impaneled to hear the case against each of them.

Preliminarily, we must provide the relevant gang context. Before his untimely demise, Robert Haynes was also a member of the Oak Park Bloods. Defendant and Allen were close friends of Haynes. A member of the Barksdale family founded the G-Mobb gang, which does not claim either Blood or Crip affiliation and includes cliques such as Guttah Boyz and Starz. In 2008 several Oak Park Bloods, including Haynes, showed up at a G-Mobb party and a shootout ensued. One of the Barksdale brothers, a Guttah Boyz member, killed Haynes, and the killing sparked an increase in unprovoked violence between the two gangs. Defendant has a tattoo memorializing his friend.

On December 14, 2010, defendant went to a barbershop to get dreadlocks and ran into two old friends. He saw a man approach one of the barbers, and as the man pulled his pants up by the belt loops, defendant saw that he had a gun. As another Barksdale brother, Marvion, approached, a gun battle erupted and defendant ran. Defendant was wounded and Barksdale was killed.

Six days later defendant and Allen planned to visit Haynes' gravesite to commemorate his birthday. Adams arrived unexpectedly and invited defendant and Allen to accompany him on a shopping errand. When they got into Adams' car, Adams gave his gun to defendant and defendant slipped it into his sling. At a shopping center in South Sacramento, Adams made a payment on a watch. Defendant then gave the gun back to Adams.

Adams drove to another shopping center in the middle of Starz territory and purchased an Astros baseball hat, a hat associated with the Starz gang. After leaving the shopping center, defendant pointed out a man he had been in a fight with a year earlier. The man, Eric Harris, was walking with his friends, Tushawn Cooks and the victim, Antonne Nelms. All three were Crips. Adams drove a little farther down the street, then abruptly backed into a gated driveway. Allen saw a police car drive by just before Adams opened fire on the trio. Nelms died at the scene.

Defendant would later describe his fight with Harris and its aftermath in some detail. "Yeah. We fought. Well look it was some stupid ass shit man. I'm at my girl house, um they -- they he used to live right downstairs from her, you feel me. I was livin with my bitch for a little bit. So me and her little brother on the balcony cuz we drinking some Hennessy up, passing it back and forth. They come -- they come out and they like uh -- like uh -- he like -- it was some weird, some little black ass dude they use to kick it wit, he was just running his mouth talking to my little brother. He like uh -- he like yeah bitch as nigga, wasn't you the one that uh -- woo -- woo -- woo. You know we can have words a minute though if I come up, come to the front so we can fight or some shit. It's three -- the three of em and then it's two of us. I'm like nigga okay nigga, fuck you niggas, we not gonna come out there so y'all can man, whatever y'all gonna do. You know what I mean. So look, we wait til the morning. You wake me up, they go out, I go -- I go downstairs for the — from the Slopes I go downstairs, they all outside, ah blah rah rah ah bla bla bla. So I'm just watchin, I'm just watchin hard, ain't got nothing to do with y'all you feel me. I'm just watchin. So they -- they -- it was three of em against my little bro and my -- and his big brother, they was gonna go try to jump him so I rushed the dude with the dreads, woo. I fight wit him, we start going back and forth and somehow uh he get on top of me and kicked me in my face and I hit my head on the ground, you feel me. And they said I was asleep. I don't remember that, you feel me. I got up and we just start running around and shit. That's when we finally calmed down, you feel me. So like a week -- a week or two later them niggas copped a little pist -- pistol or something, you feel me. They copped a little gun, they -- they was out there showing it off and shit. I don't know, I guess they got it for us. We -- it wasn't -- it wasn't no -- we wasn't gonna take it that far, you feel me. It wasn't, fuck it we just fought, so what. But why -- why we gotta go to gun play, you feel me. I told my big nigga like man, he heard about the shit. He heard the dude kicked me in my face and you know I was out for a little bit and he didn't like it. And that was that." (Transcript quoted verbatim.)

After the shooting, defendant borrowed Adams' car to drive to Haynes' grave site with Allen and defendant's twin sister. Allen testified the car smelled like gunpowder, but other than noticing the smell, they did not discuss the shooting. According to Allen, who had entered into an agreement with the prosecution whereby his maximum 13-year sentence would be reduced to 5 years, defendant later told him, "Just don't talk about it," and sent him a text message that read, "Keep that shit in the car, bro."

Defendant, Adams, and Allen were arrested nearly two months later. Adams was in possession of 5.36 grams of cocaine, $3,500 in currency, and six cell phones. During extensive interrogations, defendant and Allen both told their interrogators that Adams was the shooter. The prosecution mined the transcripts of the interrogations for damning excerpts that defendant maintains were misleading because they were presented out of order and out of context. At a minimum, the transcripts are difficult to interpret because they are full of lies and obfuscations, spoken in a somewhat foreign vernacular. Suffice it to say, the jury could draw many reasonable inferences from what defendant, Adams, and Allen said to each other and to the interrogators.

For many hours, Adams denied defendant's and Allen's accusations that he was the shooter. At the same time, he did not want to accuse either of them, which left him in a difficult situation. Ultimately, however, he admitted shooting at the three men but denied that he intended to kill anyone. According to both Adams and defendant, the killing was accidental.

What everyone did agree upon, including the participants as well as the interrogators, was the painful fact that the killing was senseless. The transcripts simply do not provide any clarity as to why the victim was shot and killed. The prosecutor insisted that Adams, at defendant's urging, shot at the three men, including Harris, in retribution for the fight Harris had been in with defendant a year earlier. In the prosecutor's view the entire incident was gang related and part and parcel of the gang culture in which they participated. Even Adams, the prosecutor contended, denied that

5

the shooting was totally random and resisted the notion that he was some monster who shot people for no reason at all. He stated, "[A]in't like, you know, we targeted them mother fuckers for any old reasons."

We know now, of course, that the jury could not agree that defendant's conduct was gang related. Defendant points to other statements Adams made during the interrogations to suggest that Adams alone made the decision to shoot toward the group, including the man defendant had identified as someone he had fought a year earlier. Because the older Adams had a tortured past himself from his involvement in gangs, he was afraid his young "stepson" might have "the tendency maybe to do something." He explained, "I wanted to kind of like, not to say, take all your stripes. I didn't want 'ya all [*sic*] to go through that crap. I've been through it already." As the interrogator paraphrased Adams' statements, "[y]ou were protecting him from himself." Adams concurred. By then, Adams had confessed, and reflecting on the special relationship he had with defendant, he acknowledged that defendant did not have to take responsibility for the shooting because he had "man[ned] up" and taken responsibility himself. Adams expressed remorse and said to defendant and Allen, "I hope y'all don't hold no ill will towards me."

The question thus posed is whether there is substantial circumstantial evidence to support the prosecution's theory that defendant aided and abetted the older Adams or whether the inferences the jury drew were based on " 'suspicion alone, or on imagination, speculation, supposition, surmise, conjecture, or guess work.' " (*People v. Morris* (1988) 46 Cal.3d 1, 21, overruled on other grounds in *In re Sassounian* (1995) 9 Cal.4th 535, 543, fn. 5.)

Defendant correctly points out "that in general neither presence at the scene of a crime nor knowledge of, but failure to prevent it, is sufficient to establish aiding and abetting its commission." (*People v. Campbell* (1994) 25 Cal.App.4th 402, 409.) "[A] person aids and abets the commission of a crime when he or she, acting with

6

(1) knowledge of the unlawful purpose of the perpetrator; and (2) the intent or purpose of committing, encouraging, or facilitating the commission of the offense, (3) by act or advice aids, promotes, encourages or instigates, the commission of the crime." (*People v. Beeman* (1984) 35 Cal.3d 547, 561.)  An aider and abettor shares the perpetrator's specific intent "when he or she knows the full extent of the perpetrator's criminal purpose and gives aid or encouragement with the intent or purpose of facilitating the perpetrator's commission of the crime." (*Id*. at p. 560.)

Viewing the evidence in favor of the verdict, as we must, we agree with the prosecutor that defendant Darrell Miller is at the center of the case.  The prosecutor presented substantial evidence that he had the motive to aid and abet the shooting since he had been involved in a fight with Harris, and Adams clearly shot in Harris's direction.  Moreover, defendant might have been particularly agitated since people associating with the same people who had killed his good friend, whose birthday he planned to commemorate that very day, recently had shot him.  Yet he was compromised in his own ability to shoot because his arm remained in a sling.

Moreover, the prosecution also introduced evidence that the jury could reasonably infer constituted consciousness of guilt and the suppression of evidence.  Defendant, together with Adams, instructed Allen not to talk to the police about the shooting, and he sent him a text message that could be interpreted to mean Allen should leave the gun in the car.  He changed his clothing after he realized he smelled like gunshot residue.  In short, the jury could infer that defendant aided and abetted the murder by holding the gun before the shooting, identifying the victim, providing the motive, and in trying to conceal the weapon and convince Allen not to talk to law enforcement after the shooting.

That is not to say that the evidence is compelling.  Defendant raises credible arguments about the paucity of evidence that he knew Adams planned to shoot at Harris and his friends, and that he shared his intent.  There is no direct evidence that they had a conversation in the car preceding the shooting.  It was not unusual for Adams to carry a

7

gun, but there was no evidence he had ever shot anyone. There is no evidence in the transcripts of the interrogations that defendant, Adams, or Allen ever said anything that indicated Adams was planning to fire, or that defendant suggested that he should, or that a shooting was imminent. Simply put, the evidence in this case is entirely circumstantial. That does not mean, however, that in viewing it in the light most favorable to the prosecution we can say that it is not substantial.

Moreover, the prosecution argued at some length that both Adams and Allen were minimizing defendant's involvement to protect him. After admitting to the shooting, Adams also conceded that he had treated defendant like a son and he did not want him to have to take responsibility for the shooting. Allen testified that he and defendant were like brothers. He placed all the blame on Adams, denying that there had been any discussion about the shooting before it happened. But the trial judge found that Allen had broken his promise to tell the truth and he nullified the agreement Allen had reached with the prosecution for a reduced sentence. Thus, the jury could reasonably find they had reason to lie and disbelieve what they said, either to the interrogators or at trial.

As we said at the outset, defendant bears a heavy burden in demonstrating that the evidence is insufficient to support a jury verdict. We do not believe the jury based its verdict on mere speculation or conjecture rather than evidence. There is evidence, albeit circumstantial. Restricted as we are by the limited scope of appellate review, we cannot say that upon " 'no hypothesis whatever is there sufficient substantial evidence to support [the [verdict]].' " (*People v. Bolin* (1998) 18 Cal.4th 297, 331.) Thus, we must defer to the wisdom of the jury and affirm the judgment.

## II

The trial court ordered defendant to pay a booking and classification fee of $347.01 pursuant to section 29550.2 of the Government Code. He did not object to the imposition of the fee. For the first time on appeal, defendant challenges the imposition of the fee because the trial court failed to make a determination of his ability to pay and the

actual administrative costs to the county.  Relying on *People v. Pacheco* (2010) 187 Cal.App.4th 1392, 1397, defendant insists that he did not forfeit this claim by failing to object at sentencing because his claim is based on insufficiency of the evidence.  The Supreme Court has held otherwise.

In *People v. McCullough* (2013) 56 Cal.4th 589, the Supreme Court held "that because a court's imposition of a booking fee is confined to factual determinations, a defendant who fails to challenge the sufficiency of the evidence at the proceeding when the fee is imposed may not raise the challenge on appeal."  (*Id*. at p. 597.)  "Given that imposition of a fee is of much less moment than imposition of sentence, and that the goals advanced by judicial forfeiture apply equally here, we see no reason to conclude that the rule permitting challenges made to the sufficiency of the evidence to support a judgment for the first time on appeal 'should apply to a finding of' ability to pay a booking fee under Government Code section 29550.2.  [Citation.]  We disapprove *People v. Pacheco*, *supra*, 187 Cal.App.4th 1392, to the extent it holds the contrary."  (*McCullough*, at p. 599.)

## DISPOSITION

The judgment is affirmed.

                                                                              RAYE_____, P. J.

We concur:

_____ROBIE_____, J.

_____HOCH_____, J.

9